[No. B147727. Second Dist., Div. One. Aug. 9, 2001.]

CONSUMER CAUSE, INC., Plaintiff and Appellant, v.
SMILECARE et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part C of the Discussion section in the majority opinion.

## COUNSEL

Law Offices of Morse Mehrban and Morse Mehrban for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Craig Thompson, Edward G. Weil and Susan S. Fiering, Deputy Attorneys General, for the State of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Stradling Yocca Carlson & Rauth, Randall J. Sherman and Adym W. Rygmyr for Defendants and Respondents.

## OPINION

**MALLANO, J.**—Plaintiff filed this action, alleging a violation of the Safe Drinking Water and Toxic Enforcement Act of 1986, commonly known as Proposition 65. Plaintiff alleged that defendants, providers of dental care, violated the act by failing to warn employees and patients that standard amalgam fillings, also called "silver fillings," contain mercury and mercury compounds, which are reproductive toxins. The trial court granted defendants' motion for summary judgment, which was based on an affirmative defense.

We conclude that the trial court misapplied the burden of producing evidence in granting the motion. Defendants had an initial burden of production to make a prima facie showing that the affirmative defense applied. Because defendants made no such showing, the burden did not shift to plaintiff to raise a triable issue. Accordingly, we reverse.

### THE DENTAL AMALGAM CONTROVERSY

Concern over the use of silver fillings is nothing new. "In dental offices around the world, cavities are treated by drilling holes in patients' teeth and filling the abscesses with a compound known as dental amalgam filling. Also known as 'silver fillings,' dental amalgam is composed of a mixture of 45 to 52 percent mercury, 35 percent silver, and varying portions of copper, zinc and tin. Mercury, a heavy metal, is used in the amalgam mixture

because, although it is liquid in its free state, when combined with other metals, it forms a paste that hardens within minutes and provides the mixture with strength and cohesiveness. Overall, amalgam is a popular material for filling cavities because it is strong, durable, and relatively inexpensive. Amalgam is used in about half of the 200 million cavity-filling procedures performed annually, while the other half of cavity fillings are done with such materials as gold, ceramics and plastics.

"The modern dental amalgam was introduced in 1812 by British chemist Joseph Bell as a silver paste, which was a combination of coins and mercury. In the United States during the 1800s, however, [the] concern of the American Society of Dental Surgeons regarding possible mercury toxicity led to mercury usage becoming an issue of malpractice. In addition, all Society members were forced to sign an oath not to use mercury-containing materials. Nonetheless, use of mercury fillings increased, because it offered dentists an economic advantage[,] and because the fillings were simple to use and durable in the mouth. By 1856, the American Society of Dental Surgeons was forced to disband due to dwindling membership caused by the debate over the mercury filling issue. In its place rose the American Dental Association . . . , which was founded by dentists who advocated silver amalgam-mercury use in dentistry. [¶] . . . [¶]

"Over the past few years, several studies have reported that dental amalgam fillings continuously leak small amounts of mercury into the oral cavity. . . . Vaporization of the mercury from dental fillings is further intensified by chewing, tooth brushing and consumption of hot liquids. After mastication or tooth brushing, it takes almost ninety minutes for the rate of mercury vaporization to decline to pre-chewing level. In addition, a greater number of fillings over a larger chewing surface area lead[s] to even higher levels of mercury.

"[S]tudies have demonstrated that brushing filled teeth increases the level of mercury vapor in expired air, and that when exposed to mercury, individuals inhale and absorb as much as 80 percent of the vapors. Even human autopsy evidence has indicated that brain and kidney tissues contain significantly higher amounts of mercury in individuals with mercury fillings, and the concentration of mercury in the brain of subjects with mercury fillings correlate[s] directly with the number of fillings present.

"Recent experimentation on sheep and monkeys suggests that dental mercury accumulates in all tissues on the adult and is at its highest level in the kidney and liver. In fact, human studies have recently shown an association between urinary mercury excretion and the presence of mercury fillings.

These results corroborate the results of human autopsy studies. Of particular interest, is the potential effect of mercury fillings on the unborn child. In studies where fillings were installed in the teeth of pregnant sheep, mercury amalgam was shown to cross the placenta and accumulate in the developing fetus within two days of the filling's installation. The mercury was found at the highest level in the fetal liver and the mother's milk, suggesting an additional form of transmission to newborns.

"During the past two decades, more concerns have been raised about possible adverse medical side effects from the mercury in dental amalgam fillings. It has been suggested that mercury exposure is responsible for a wide variety of systemic ill effects in some patients, including immune suppression, neurotoxicity, renal impairment, obstetric complications, multiple sclerosis and conditional symptoms such as headache, fatigue and depression." (Miller, *Mercury Amalgam Fillings: Human and Environmental Issues Facing the Dental Profession* (1996) 1 DePaul J. Health Care L. 355, 355-359, fns. omitted.)

"Very young children are more sensitive to mercury than adults. Mercury in the mother's body passes to the fetus and may accumulate there. It can also . . . pass to a nursing infant through breast milk. However, the benefits of breast feeding may be greater than the possible adverse effects of mercury in breast milk.

"Mercury's harmful effects that may be passed from the mother to the fetus include brain damage, mental retardation, incoordination, blindness, seizures, and inability to speak. Children poisoned by mercury may develop problems [with] their nervous and digestive systems, and kidney damage." (Agency for Toxic Substances and Disease Registry (Apr. 1999) Chemical Abstracts Service No. 7439-97-6, <http://www.atsdr.cdc.gov/tfacts46.html> [as of Aug. 8, 2001].)

One report, which summarizes the findings of 229 studies, surveys, and papers, has concluded: "Mercury from amalgam in pregnant women crosses the placenta and appears in amniotic fluid and fetal blood, liver, and pituitary gland within 2 days of placement . . . . Mercury is often stored in breast milk and [in] the fetus at much higher levels than that in the mother's tissues . . . . The highest level is in the pituitary gland of the fetus which affects development of the endocrine, immune, and reproductive systems." (Dental Amalgam Scientific Facts (Windham edit.) pt. II, No. 19 <http://www.web-light.nl/AMALGAM/EN/frame_r.html> [as of Aug. 8, 2001], citations omitted.) "The level of mercury in the brain tissue of the fetus, new born, and young children is directly proportional to the number of amalgam

surfaces in the mother's mouth." (*Id.*, No. 18.) "Mercury has an effect on the fetal nervous system at levels far below that considered toxic in adults, and background [levels] of mercury in mothers correlate significantly with incidence of birth defects and still births . . . ." (*Id.*, pt. III, No. 16.)

But dental amalgam is not without its supporters. The American Dental Association (ADA) has long approved its use. As recently as May 11, 2001, the ADA issued a "Statement on Dental Amalgam," saying: "Dental amalgam (silver filling) is considered a safe, affordable and durable material that has been used to restore the teeth of more than 100 million Americans. It contains a mixture of metals such as silver, copper and tin, in addition to mercury, which chemically binds these components into a hard, stable and safe substance. Dental amalgam has been used for more than 150 years and, during that time, has established an extensively reviewed record of safety and effectiveness.

"Issued in late 1997, the FDI World Dental Federation and the World Health Organization consensus 'statement on dental amalgam stated, 'No controlled studies have been published demonstrating systemic adverse effects from amalgam restorations.' The document also states that, aside from rare instances of local side effects of allergic reactions, 'the small amount of mercury released from amalgam restorations, especially during placement and removal, has not been shown to cause any . . . adverse health effects.'

"The ADA's Council on Scientific Affairs' 1998 report on its review of the recent scientific literature on amalgam states: 'The Council concludes that, based on available scientific information, amalgam continues to be a safe and effective restorative material.' The Council's report also states, 'There currently appears to be no justification for discontinuing the use of dental amalgam.' [¶] . . . [¶]

"The U.S. Public Health Service issued a report in 1993 stating there is no health reason not to use amalgam, except in the extremely rare case of the patient who is allergic to a component of amalgam. This supports the findings of the Food and Drug Administration, the National Institutes of Health Technology Assessment Conference and the National Institute of Dental and Craniofacial Research, that dental amalgam is a safe and effective restorative material. In addition, in 1991, Consumer Reports noted, 'Given their solid track record . . . amalgam fillings are still your best bet.'

"In 1991, the U.S. Food and Drug Administration's Dental Products Panel found no valid data to demonstrate clinical harm to patients from amalgams or that having them removed would prevent adverse health effects or reverse

the course of existing diseases. The U.S. Public Health Service found in 1993 'no persuasive reason to believe that avoiding amalgams or having them removed will have a beneficial effect on health.' In fact, it is inadvisable to have amalgams removed unnecessarily because it can cause structural damage to healthy teeth.

"The ADA supports ongoing research in the development of new materials that it hopes will someday prove to be as safe and effective as dental amalgam. However, the ADA continues to believe that amalgam is a valuable, viable and safe choice for dental patients and concurs with the findings of the U.S. Public Health Service that amalgam has 'continuing value in maintaining oral health.' " (Am. Dental Assn., *Statement on Dental Amalgam* (May 11, 2001) <http://www.ada.org/prof/prac/issues/statements/amalgam.html> [as of Aug. 8, 2001].)

The State of California has classified mercury and mercury compounds as reproductive toxins since July 1, 1990. (Cal. Code Regs., tit. 22, § 12000, subd. (c)(1).) "Mercury is a highly toxic metal that is more dangerous than lead, cadmium and arsenic in relation to its effect on the body." (Leading Edge Research Group, *Mercury Amalgam: Contamination of Human Neurophysiology* (1996) <http://www.trufax.org/mercury/mercl.html> [as of Aug. 8, 2001]; accord, Note, *Up in Smoke: The Need for International Regulation of Hazardous Waste Incineration* (1994) 29 Tex. Internat. L.J. 257, 264 [highly toxic substances include mercury and high-level radioactive waste; less toxic substances include arsenic, lead, copper, and zinc].)

In short, a wealth of information exists on both sides of the dental amalgam controversy, much of it on the Internet. (Compare The Dental Amalgam Issue [opposing use of silver fillings] <http://www.amalgam.org> [as of Aug. 8, 2001] with Possible Health Effects and Dental Amalgam [supporting use of silver fillings] <http://www.odont.lu.se/ projects/NBHW/amalgam.html> [as of Aug. 8, 2001].)

PROPOSITION 65

The Safe Drinking Water and Toxic Enforcement Act of 1986 (the Act) was passed as an initiative, Proposition 65, by a vote of the people on November 4, 1986. It is codified in the Health and Safety Code (§§ 25249.5-25249.13). The Act is intended to deter businesses from contaminating sources of drinking water and to require businesses to warn individuals about carcinogens and reproductive toxins to which they are exposed through consumer transactions, employment, and the environment. (Cal. Code Regs., tit. 22, § 12601, subds. (b), (c).) ■ Because "Proposition 65

[is] a remedial statute intended to protect the public . . . . [w]e construe the statute broadly to accomplish that protective purpose." (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 314 [58 Cal.Rptr.2d 855, 926 P.2d 1042].) Section 1 of Proposition 65 states:

" 'The people of California find that hazardous chemicals pose a serious potential threat to their health and well-being, that state government agencies have failed to provide them with adequate protection, and that these failures have been serious enough to lead to investigations by federal agencies of the administration of California's toxic protection programs. The people therefore declare their rights:

" '(a) To protect themselves and the water they drink against chemicals that cause cancer, birth defects, or other reproductive harm.

" '(b) To be informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm.

" '(c) To secure strict enforcement of the laws controlling hazardous chemicals and deter actions that threaten public health and safety.

" '(d) To shift the cost of hazardous waste cleanups more onto offenders and less onto law-abiding taxpayers.' " (Ballot, Pamp. Gen. Elec. (Nov. 4, 1986) text of Prop. 65, § 1, p. 53, reprinted in Historical and Statutory Notes, 40C West's Ann. Health & Saf. Code (1999 ed.) foll. § 25249.5, pp. 279-280.)

The present case concerns reproductive toxins that cause adverse developmental effects. (See Cal. Code Regs., tit. 22, § 12000, subd. (c)(1), p. 182, col. 2.) Under the Act, the Governor is required to publish, at least once a year, a list of chemicals known to the state to cause reproductive toxicity. (Health & Safety Code, § 25249.8, subd. (a); all further section references are to the Health and Safety Code unless otherwise indicated.)

A chemical is "known to the state to cause . . . reproductive toxicity . . . if in the opinion of the state's qualified experts it has been clearly shown through scientifically valid testing according to generally accepted principles to cause . . . reproductive toxicity, or if a body considered to be authoritative by such experts has formally identified it as causing . . . reproductive toxicity, or if an agency of the state or federal government has formally required it to be labeled or identified as causing . . . reproductive toxicity." (§ 25249.8, subd. (b).) The list of chemicals known to the state to cause reproductive toxicity includes mercury and mercury compounds (hereafter mercury). (Cal. Code Regs., tit. 22, § 12000, subd. (c)(1), p. 182, col. 2.)

One of the Act's principal sections states that "[n]o *person in the course of doing business* shall *knowingly* and intentionally *expose* any individual to a

chemical known to the state to cause . . . reproductive toxicity without first giving clear and reasonable warning to such individual . . . ." (§ 25249.6, italics added.)

The term "person" includes individuals and various entities. (§ 25249.11, subd. (a).) The phrase "[p]erson in the course of doing business" does not include certain public entities or an employer with fewer than 10 employees. (§ 25249.11, subd. (b); see § 25249.5.)

" 'Knowingly' refers only to knowledge of the fact that a discharge of, release of, or exposure to a chemical listed . . . [as a reproductive toxin] is occurring." (Cal. Code Regs., tit. 22, § 12201, subd. (d).) In general, "[n]o knowledge that the discharge, release or exposure is unlawful is required." (*Ibid.*)

The term "expose" means "to cause to ingest, inhale, contact via body surfaces or otherwise come into contact with a chemical." (Cal. Code Regs., tit. 22, § 12201, subd. (f).) "An individual may come into contact with a chemical through water, air, food, consumer products and any other environmental exposure as well as occupational or workplace exposures." (*Ibid.*)

The "level in question" means "the chemical concentration of a listed chemical for the exposure in question." (Cal. Code Regs., tit. 22, § 12821, subd. (a).)

The Act's warning requirement (§ 25249.6) is subject to statutory exemptions, one of which applies to "[a]n exposure for which the *person responsible can show* that the exposure . . . will have no observable effect assuming exposure at *one thousand (1,000) times the level in question* for substances known to the state to cause reproductive toxicity . . . ." (§ 25249.10, subd. (c), italics added (hereafter exposure exemption).) "In any action brought to enforce [the warning requirement,] the *burden of showing* that an exposure meets the criteria of this subdivision shall be on the *defendant.*" (*Ibid.*, italics added.)

Thus, if a provider of dental care knowingly and intentionally exposes employees and patients to mercury without a warning, it has the burden of showing that an exposure 1,000 times the level in question will not cause any observable reproductive harm. (The exposure exemption is not the only exemption under the Act (see § 25249.10, subds. (a), (b)), but the others are not applicable.)

The Act is enforced in accordance with regulations promulgated by the Office of Environmental Health Hazard Assessment, the primary agency that

implements the Act. (See Cal. Code Regs., tit. 22, §§ 12301, 12302, 12305; *id.*, appen. A. foll. § 12903, p. 199.) Under the regulations, a defendant can seek the protection of the exposure exemption by providing specified data about the effect of a reproductive toxin. In particular, a defendant must establish: (1) the "no observable effect level," or "NOEL," which is the "maximum dose level at which a chemical has no observable reproductive effect" (Cal. Code Regs., tit, 22, § 12801, subd. (c)); and (2) the level of exposure in question.

A. *Maximum Dose Level*

The calculation of the NOEL involves a highly technical, scientific inquiry. "The determination of whether a level of exposure to a chemical known to the state to cause reproductive toxicity has no observable effect [at 1,000 times the level in question] shall be based on evidence and standards of comparable scientific validity to the evidence and standards which form the scientific basis for the listing of a chemical as known to the state to cause reproductive toxicity." (Cal. Code Regs., tit. 22, § 12801, subd. (a).) While other evidence and standards are permitted (*ibid.*), a defendant must still perform a "quantitative risk assessment" regardless of the type of evidence or standard used (Cal. Code Regs., tit. 22, §§ 12801, subds. (a), (b)(1), 12803; see also *id.*, §§ 12801, subd. (b)(2), 12805).

A quantitative risk assessment determines the maximum dose level having no observable reproductive effect, assuming an exposure 1,000 times the level in question. (§ 25249.10, subd. (c); Cal. Code Regs., tit. 22, §§ 12801, subd. (b)(1), 12803.) The assessment has to be based on studies producing the reproductive effect that provided the basis for listing the substance as a reproductive toxin in the first place. (Cal. Code Regs., tit. 22, § 12803, subd. (a)(1).) The NOEL must be the highest dose level that results in no observable reproductive effect. (*Ibid.*) The quality and suitability of any epidemiological data must be examined in deciding whether the data is appropriate. (*Id.*, subd. (a)(2).) Any comparative animal studies must satisfy generally accepted scientific principles. (*Id.*, subd. (a)(3).) The NOEL must be based on the most sensitive study of sufficient quality (*id.*, subd. (a)(4)), and must be converted into a milligram per day dose level by multiplying the NOEL by an assumed human body weight—70 kilograms for a male, 58 kilograms for a female (*id.*, subd. (b)).

B. *Level of Exposure*

"The exposure in question includes the exposure for which the person in the course of doing business is responsible . . . ." (Cal. Code Regs., tit. 22,

§ 12821, subd. (a).) The level of exposure to a reproductive toxin "shall be determined by multiplying the level in question (stated in terms of a concentration of a chemical in a given medium) times the reasonably anticipated rate of exposure for an individual to a given medium. The reasonably anticipated rate of exposure shall be based on the pattern and duration of exposure that is relevant to the reproductive effect which provided the basis for the determination that a chemical is known to the state to cause reproductive toxicity." (*Id.*, subd. (b).)

"For exposures to consumer products, the level of exposure shall be calculated using the reasonably anticipated rate of intake or exposure for average users of the consumer product, and not on a per capita basis for the general population. The rate of intake or exposure shall be based on data for use of a general category or categories of consumer products . . . ." (Cal. Code Regs., tit. 22, § 12821, subd. (c)(2).)

The level of exposure is also based on certain assumptions about people in general, including the amount of air they breathe, the amount of water they drink, and their life expectancy. (Cal. Code Regs., tit. 22, §§ 12821, subd. (c)(1), 12721, subd. (d).) For an exposure to a fetus, a nine-month gestation period is used. (*Ibid.*)

## C. *Determination of Exemption*

A defendant is exempt from warning others about a reproductive toxin if the level of exposure in question is 1,000 times below the NOEL. If the defendant is not exempt, it must provide a warning that is "reasonably calculated, considering the alternative methods available under the circumstances, to make the warning message available to the individual prior to exposure." (Cal. Code Regs., tit. 22, § 12601, subd. (a).) The warning "may be provided by general methods such as labels on consumer products, inclusion of notices in mailings to water customers, posting of notices, placing notices in public news media, and the like, provided that the warning accomplished is clear and reasonable." (§ 25249.11, subd. (f).)

### PROCEDURAL HISTORY

On February 28, 2000, Consumer Cause, Inc., filed this action on behalf of the general public, naming Community Dental Services, Inc., and Smile-Care as defendants. Subsequently, Consumer Cause filed a first amended complaint, alleging that defendants had violated the Act (§ 25249.6) and the California unfair competition law (Bus. & Prof. Code, § 17200 et seq.).

More specifically, Consumer Cause alleged that defendants had violated the Act by exposing employees and patients to amalgam fillings containing

mercury—a reproductive toxin—without providing the requisite warning. (See Cal. Code Regs., tit. 22, § 12000, subd. (c)(1), p. 182, col. 2.) The amended complaint did not contain any allegations concerning whether defendants came within the exposure exemption. As a second cause of action, Consumer Cause alleged that defendants' violations of the Act also violated the prohibition on unlawful business acts and practices under the unfair competition law. (See Bus. & Prof. Code, § 17200.)

Defendants filed an answer, alleging as an affirmative defense that their "actions were permissible pursuant to California Health & Safety Code § 25249.10(c)[, i.e., the exposure exemption]." Shortly after answering the complaint, defendants filed a motion for summary judgment, which relied on two categories of evidence: (1) Consumer Cause's discovery responses, which admitted that Consumer Cause did not have any evidence to dispute the applicability of the exposure exemption; and (2) the declaration of a dentist, Dr. Louis J. Amendola, who stated that standard amalgam fillings contain trace amounts of mercury, have been used safely in the United States for 150 years, and are approved by the ADA. In their moving papers, defendants admitted that, for purposes of summary judgment, they use amalgam fillings containing mercury.

In opposition, Consumer Cause argued that the warning exemption was an affirmative defense and that defendants had the burden of making a prima facie showing that the defense applied. Consumer Cause asserted that, because defendants had not made such a showing, the motion should be denied.

By order dated January 16, 2001, the trial court granted summary judgment. On the same day, the trial court entered judgment in defendants' favor. Consumer Cause filed a timely appeal.

DISCUSSION

We first address the evidentiary burdens applicable to a defense motion for summary judgment in a Proposition 65 case where the defendant invokes the exposure exemption to the warning requirement (§§ 25249.10, subd. (c), 25249.6). We then apply those burdens to the summary judgment motion in this case. Finally, in an unpublished portion of the opinion, we turn to the remedy available on Consumer Cause's claim under the unfair competition law.

A. *The Burden on Summary Judgment*

Defendants rely on our decision in *Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472 [50 Cal.Rptr.2d 785], where we stated: "Under the

current version of the summary judgment statute, a moving defendant need not support his motion with affirmative evidence negating an essential element of the responding party's case. Instead, the moving defendant may (through factually vague discovery responses or otherwise) point to the *absence of evidence to support the plaintiff's case*. When that is done, the burden shifts to the plaintiff to present evidence showing there is a triable issue of material fact. If the *plaintiff is unable to meet her burden of proof regarding an essential element of her case*, all other facts are rendered immaterial." (*Id.* at p. 482, second italics added.)

We have also stated that a 1993 amendment to the summary judgment statute (Code Civ. Proc., § 437c, as amended by Stats. 1993, ch. 276, § 1, pp. 1969-1974) "changed our state court procedure dramatically, from one where a moving defendant was required to present affirmative evidence *conclusively negating an element of the plaintiff's case . . .* to one where the defendant can satisfy its evidentiary burden by proof of the *plaintiff's inability to prove its own case* (by evidence in the form of the plaintiff's factually vague discovery responses)." (*Certain Underwriters at Lloyd's of London v. Superior Court* (1997) 56 Cal.App.4th 952, 959 [65 Cal.Rptr.2d 821], italics in original.)

But defendants fail to grasp that their motion for summary judgment did not seek to negate an element of Consumer Cause's claims, conclusively or otherwise. Rather, the motion was based on an affirmative defense, i.e., exposure to mercury had no observable reproductive effect at 1,000 times the level in question. (See § 25249.10, subd. (c).)

By statute, "[a]ny party may move for summary judgment in any action or proceeding if it is contended that the action has no *merit* or that there is no defense to the action or proceeding." (Code Civ. Proc., § 437c, subd. (a), italics added.) "A cause of action has no *merit* if either of the following exists: [¶] (1) One or more of the elements of the cause of action cannot be separately established, even if that element is separately pleaded. (2) A *defendant* establishes an *affirmative defense* to that cause of action." (*Id.*, subds. (n)(1), (2), italics added.) "A defendant . . . has met his or her burden of showing that a cause of action has no *merit* if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a *complete defense* to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a *defense thereto*." (*Id.*, subd. (*o*)(2), italics added.)

"The burden on a defendant moving for summary judgment based upon the assertion of an affirmative defense is [different] than the burden to

show [that] one or more elements of the plaintiff's cause of action cannot be established. Instead of merely submitting evidence to negate a single element of the plaintiff's cause of action, or offering evidence such as vague or insufficient discovery responses that the plaintiff does not have evidence to create an issue of fact as to one or more elements of his or her case . . . 'the defendant has the initial burden to show that undisputed facts support each element of the affirmative defense' . . . . If the defendant does not meet this burden, the motion must be denied." (*Anderson v. Metalclad Insulation Corp.* (1999) 72 Cal.App.4th 284, 289-290 [85 Cal.Rptr.2d 331], italics omitted; accord, Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2001) ¶¶ 10:241, 10:242, 10:246 to 10:249, pp. 10-77, 10-78, 10-83 to 10-85 (rev. # 1, 2001).)

" '[T]here is no obligation on the opposing party (plaintiffs here) to establish anything by affidavit unless and until the moving party has by affidavit stated " 'facts establishing *every element* [of the affirmative defense] necessary to sustain a judgment in his favor. . . .' " ' . . . [¶] What this means . . . is that if an affirmative defense has four elements, it does not suffice even if the defendant produces *overwhelming* evidence as to three of those elements. If the defendant fails to address the fourth element at all or to produce substantial evidence supporting that element, the trial court cannot properly grant summary judgment. Moreover, a summary judgment granted in those circumstances would have to be reversed, *even if the plaintiff failed to introduce a scintilla of evidence challenging that element.*" (*Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825, 830-831 [20 Cal.Rptr.2d 296], citations omitted, third italics added, bracketed material added in *Huynh.*)

As our Supreme Court recently explained: "[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the *applicable standard of proof.* . . ." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [26 Cal.4th 80a, 107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*), citation and fn. omitted, italics added.)

"[T]he party moving for summary judgment bears an *initial burden of production to make a prima facie showing* of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of

his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. . . .

"[The way in which] the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* [party] would bear *what* burden of proof at trial." (*Aguilar, supra*, 25 Cal.4th at pp. 850-851, first italics added.)

## B. *The Burden as Applied in this Case*

■ We conclude that defendants' summary judgment motion should have been denied. In their motion, defendants assumed, for the sake of argument, that they had knowingly and intentionally exposed employees and patients to mercury without providing a warning. They relied on the exposure exemption—an affirmative defense—and claimed that a warning was unnecessary.

Of course, *at trial*, a defendant raising an affirmative defense has the burden of proving it. (*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 794-795 [85 Cal.Rptr.2d 844, 978 P.2d 2]; *Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 54 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; see § 25249.10, subd. (c).) Under the Act, a defendant relying on the exposure exemption *at trial* would have to establish the NOEL, the level of exposure in question, and, ultimately, that the level of exposure was 1,000 times below the NOEL. (§ 25249.10, subd. (c); Cal. Code Regs., tit. 22, §§ 12801, subds. (a), (b)(1), (c), 12803.)

Therefore, *at the summary judgment stage*, the defendants in the present case had an initial burden of production to make a prima facie showing that their conduct came within the exposure exemption. (See § 25249.10, subd. (c); Code Civ. Proc., § 437c, subds. (n)(2), (o)(2); *Anderson v. Metalclad Insulation Corp., supra*, 72 Cal.App.4th at pp. 289-290; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra*, ¶¶ 10:241, 10:242, 10:246 to 10:249, pp. 10-77, 10-78, 10-83 to 10-85 (rev. # 1, 2001).) If they failed to meet that burden, "the plaintiff need not make any showing at all." (*Pepperell v. Scottsdale Ins. Co.* (1998) 62 Cal.App.4th 1045, 1054 [73 Cal.Rptr.2d 164].)

Defendants contend that Dr. Amendola's declaration, together with Consumer Cause's discovery responses, shifted the burden of production to Consumer Cause. We disagree, as does the Attorney General of the State of California in his amicus curiae brief. The Attorney General states:

"Amicus Curiae, the People of the State of California . . . , *ex rel.* Bill Lockyer, the Attorney General of the State of California, file this amicus brief to urge the Court to reverse the decision of the trial court granting summary judgment . . . . [T]he trial court *misconstrued the burden of proof in a Proposition 65 action and the evidence necessary to meet that burden of proof*, and improperly dismissed plaintiff Consumer Cause, Inc.'s claims. [¶] . . . [¶]

"The People file this brief because of their interest in this matter. The Attorney General is constitutionally designated as the 'chief law officer of the state' and has the constitutional duty to ensure that state law is adequately enforced. . . . Under Proposition 65, the Attorney General sues 'in the name of the People of the State of California' . . . which signifies that the action is an exercise of the sovereign power. . . . The Attorney General is the only official permitted to sue on behalf of the People. As the principal enforcer of Proposition 65, the Attorney General has a significant interest in decisions interpreting the *proper burden of proof in a Proposition 65 action.*" (Italics added.)

### 1. *Dr. Amendola's Declaration*

In his declaration, Dr. Amendola stated that (1) standard dental amalgam contains only a trace amount of mercury, (2) amalgam fillings have been used safely throughout the country for 150 years, (3) the ADA has approved the use of amalgam fillings, and (4) there is no scientific evidence, to his knowledge, suggesting that amalgam fillings cause any adverse physical effect with the exception of allergic reactions in some people.

We find Dr. Amendola's declaration to be woefully inadequate in several respects. It does not discuss or even mention the NOEL, the level of exposure in question, or the relationship between the two. In addition, Dr. Amendola's representation that amalgam fillings are "safe" ignores the standards imposed by the Act. As the Attorney General has stated in his amicus curiae brief:

"[W]hat is at issue in the exemption is not the 'safety' of the product causing the exposure, but rather whether the exposure is one thousand times below the 'no observable effect' level. Thus, even products, whose use is sanctioned by state and federal regulatory agencies, may still require a Proposition 65 warning. [¶] . . . [¶]

"Nothing in the declaration [of Dr. Amendola] indicates that [he] is a toxicologist or has any expertise in either risk assessment or exposure

assessment. . . . Even assuming that all of Dr. Amendola's statements are true, Dr. Amendola said nothing about . . . the level of exposure to mercury caused by dental amalgam, and nothing about whether the exposure is one thousand times below the NOEL. Furthermore, he could not have made such statements because of his apparent lack of expertise."

We conclude that, because Dr. Amendola's declaration does not address any of the relevant factors under the exposure exemption, it is not entitled to any weight.

### 2. *Consumer Cause's Discovery Responses*

In moving for summary judgment, defendants also relied upon Consumer Cause's responses to requests for admissions and special interrogatories. The question, then, is whether Consumer Cause's discovery responses—without any support from Dr. Amendola's deficient declaration—shifted the burden of production to Consumer Cause. We think not.

One of the requests for admissions stated: "Admit that exposure to mercury at one thousand times *the level you contend defendants have exposed individuals to* will have no observable effect on the individuals." (Italics added.) Consumer Cause responded that, despite a reasonable inquiry, it "lacks sufficient information or knowledge to admit the matter. . . ." In responding to other requests for admissions, Consumer Cause admitted that it did not have any evidence that defendants' use of mercury had caused injury to anyone, nor did it have evidence concerning the level of mercury to which defendants had allegedly exposed individuals.

As for the interrogatories, special interrogatory No. 3 asked, "Do *you contend* that exposure to mercury at one thousand times *the level you believe Defendants have exposed individuals to* will result in observable effects to the individual?" (Italics added.) Consumer Cause answered, "No." The next interrogatory asked, "If your answer to the [preceding interrogatory] is anything other than an unqualified negative, IDENTIFY all facts in support of your response thereto." Consumer Cause responded, "Not applicable."

Another interrogatory asked Consumer Cause to identify all facts "regarding *the level of mercury to which you claim Defendants have exposed INDIVIDUALS.*" (Italics added.) Consumer Cause stated: "Responding party has *made no allegation* regarding the level of mercury to which defendants have exposed individuals. Therefore, responding party is not in possession of such facts." (Italics added.)

The two succeeding interrogatories asked Consumer Cause to identify all documents and individuals, respectively, "regarding *the level of mercury to*

*which you claim Defendants have exposed individuals.*" (Italics added.) Consumer Cause's response to both interrogatories stated: "Responding party has *made no allegation* regarding the level of mercury to which defendants have exposed individuals. Therefore, responding party is not in possession of such information." (Italics added.)

The last interrogatory asked Consumer Cause to identify any injuries attributed to defendants' conduct. Consumer Cause replied, "Responding party has *made no allegation* regarding any injuries to individuals attributable to defendants' conduct. Therefore, responding party is not in possession of such information." (Italics added.)

On an appeal from summary judgment, we do not examine the opposing party's discovery responses in isolation. Where, as here, the trial court has granted a defendant's motion for summary judgment, the plaintiff's discovery responses are pertinent only if they are used to support undisputed "facts" in the defendant's separate statement. ■ As we have previously stated: "[A]*ll* material facts must be set forth in the separate statement. 'This is the Golden Rule of Summary Adjudication: if it is not set forth in the separate statement, *it does not exist.* Both the court and the opposing party are entitled to have all the facts upon which the moving party bases its motion plainly set forth *in the separate statement.*'" (*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 337 [282 Cal.Rptr. 368], italics in original, superseded by statute on another point, as stated in *Certain Underwriters at Lloyd's of London v. Superior Court, supra,* 56 Cal.App.4th at p. 957, fn. 4; accord, *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].)

In their separate statement, defendants relied on Consumer Cause's discovery responses in support of two allegedly undisputed facts: (1) "Plaintiff has no evidence that defendants' alleged exposure of individuals to mercury . . . will have an observable effect assuming exposure at 1000 times the level used by defendants"; and (2) "Defendants' alleged exposure of individuals to mercury . . . will have no observable effect assuming exposure at 1000 times the level used by defendants."

In its responsive statement, Consumer Cause admitted that it had no evidence indicating that defendants' exposure of individuals to mercury would cause an observable effect at 1,000 times the level in question. As to the second alleged fact, Consumer Cause responded: "Disputed. Since defendants have not shown a complete defense under Health & Safety Code section 25249.10, subdivision (c)[, i.e., the exposure exemption], plaintiff has no evidentiary burden. . . ."

 We conclude that Consumer Cause's responses to defendants' separate statement did not warrant summary judgment. Both of the alleged facts concerned the applicability of defendants' affirmative defense, as to which they had—but did not satisfy—the burden of production.

### a. *Consumer Cause's Lack of Evidence*

Defendants had an initial burden to make a prima facie showing that the exposure exemption applied. That showing, however, could not be based on Consumer Cause's *lack of evidence to disprove* the applicability of the defense. (See *Anderson v. Metalclad Insulation Corp., supra,* 72 Cal.App.4th at pp. 289-290; *Huynh v. Ingersoll-Rand, supra,* 16 Cal.App.4th at pp. 830-831; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra,* ¶¶ 10:235 to 10:237, pp. 10-75 to 10-76 (rev. # 1, 2001).) Defendants' contrary contention puts the cart before the horse.

Consumer Cause did not have to offer any evidence disputing the applicability of the exposure exemption until defendants made the requisite initial showing. Were it otherwise, a defendant's initial burden in moving for summary judgment on an affirmative defense would be no burden at all— even though defendants would have the burden of proof at trial. (See *Ramirez v. Yosemite Water Co., supra,* 20 Cal.4th at pp. 794-795; *Bertero v. National Corp., supra,* 13 Cal.3d at p. 54.) "[I]t is not plaintiff's initial burden to disprove affirmative defenses . . . asserted by defendant." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial, *supra,* ¶ 10:235, p. 10-75 (rev. # 1, 2001).)

As stated, Dr. Amendola's declaration did not come close to making a prima facie showing that defendants' conduct came within the exposure exemption. As a result, the burden of production did not shift to Consumer Cause, and its lack of evidence was of no consequence.

### b. *Consumer Cause's Contentions*

 "A summary judgment should not be based on tacit admissions or fragmentary and equivocal concessions, which are contradicted by other credible evidence." (*Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 482 [261 Cal.Rptr. 735]; see *id.* at pp. 481-482; accord, *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 961-962 [62 Cal.Rptr.2d 142].) To protect the interests of the party opposing summary judgment, its "admissions[, if any,] should be . . . careful[ly] examin[ed] in light of the *entire* record." (*Mason v. Marriage & Family Center* (1991) 228 Cal.App.3d 537, 546 [279 Cal.Rptr. 51], italics added; accord, *Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64, 78 [81 Cal.Rptr.2d 360].)

■ Virtually all of the discovery propounded by defendants assumed that Consumer Cause had formed an opinion or adopted a position regarding the *specific* level of exposure to which individuals had actually been exposed. That was an erroneous assumption, and, as such, it has no legal significance.

Consumer Cause's discovery responses, *viewed in light of the entire record*, did not contend or admit that defendants had exposed individuals to a *specific* level of mercury. Instead, consistent with its burden of proof under the Act, Consumer Cause simply alleged that defendants had knowingly and intentionally exposed employees and patients to mercury without a warning. That allegation—unchallenged for purposes of summary judgment—put *the burden on defendants* to make a prima facie showing that the level of exposure was within the limits set by the Act: "In any action brought to enforce [the warning requirement,] the *burden of showing* that an exposure [is exempt] shall be on the *defendant.*" (§ 25249.10, subd. (c), italics added.)

Consumer Cause did not have to fund scientific studies or collect medical data to establish the NOEL or to gauge the level of exposure at defendants' offices. Nor did it have to hazard a guess. Under the Act, *defendants*, not Consumer Cause, *had to contend* that the exposure was at a *specific* level— 1,000 times below the NOEL. By not alleging a specific level of exposure, Consumer Cause did not concede the level to be 1,000 times below the NOEL. As stated in Consumer Cause's separate statement, "[s]ince defendants have not shown a complete defense under . . . [the exposure exemption], plaintiff has no evidentiary burden. . . ." We cannot fault a party for providing discovery responses that comport with its burden of proof under the Act.

Thus, defendants did not satisfy their burden of production by relying on Consumer Cause's lack of contentions. Indeed, at oral argument, counsel for defendants agreed with that conclusion. He stated that summary judgment was proper because it was based on *both* Consumer Cause's discovery responses *and* Dr. Amendola's declaration.

During argument, the court referred to Consumer Cause's interrogatory answers and asked defendants' counsel: "You are of the view that by submitting their answers to your interrogatories, you have met your burden of proof?" Counsel replied, "Well, not just that but the declaration of Dr. Amendola . . . ." At another point, defense counsel stated, "And so the combination of the declaration and the interrogatory responses . . . justifies the summary judgment."

Also during argument, the court focused on Consumer Cause's negative answer to special interrogatory No. 3, which asked: "Do *you contend* that

exposure to mercury at one thousand times *the level you believe Defendants have exposed individuals to* will result in observable effects to the individual?" (Italics added.) The court inquired of defendants' counsel, "If the declaration, for whatever reason, is inadequate in our view, is it your position that their answer to the interrogatory is by itself sufficient to have met your burden of proof, initially?" Defense counsel answered: "I would be forced to say, no, and if that's all we came up with, then we would not be in a position for summary judgment."

As we have already explained, Dr. Amendola's declaration is entitled to no weight. And, as defendants correctly state, they could not rely on Consumer Cause's discovery responses alone to satisfy their burden of production. As a result, under defendants' own theory of the case, summary judgment was improper. (See *Browne v. Superior Court* (1940) 16 Cal.2d 593, 599 [107 P.2d 1, 131 A.L.R. 276] [counsel's concessions and admissions at oral argument are binding]; *Franklin v. Appel* (1992) 8 Cal.App.4th 875, 893, fn. 11 [10 Cal.Rptr.2d 759] [same]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 665(c), p. 698 [same].)

We note that, in responding to special interrogatory No. 3, Consumer Cause was faced with a Hobson's choice. By answering "no"—as it did—Consumer Cause stands accused of conceding defeat. But had Consumer Cause answered "yes" and then stated, in the succeeding interrogatories, that it had no facts, documents, or witnesses to support its answer, it would be accused of making an unfounded contention. Either way, defendants come out the winner.

However, as Consumer Cause has amply demonstrated, its interrogatory answer, like its other discovery responses, was based on the premise that it had *made no allegation* regarding the *specific* level of mercury to which individuals had been exposed. The answer to special interrogatory No. 3 conceded nothing because it was consistent with Consumer Cause's burden of proof under the Act. Thus, "[i]n this case [Consumer Cause's] explanation of [its] response to the interrogatory, viewed in light of the whole record, is [satisfactory]." (*Mason v. Marriage & Family Center, supra*, 228 Cal.App.3d at p. 546.)

The Attorney General agrees, stating in his amicus curiae brief: "The Dental Defendants further based their argument on the fact that, in discovery, Consumer Cause stated that it lacked information about the level of exposure to mercury from dental amalgam, had no contention that exposure to mercury at one thousand times the level in question would result in observable effects, and had no evidence that defendants caused injury by

exposing individuals to mercury. [¶] . . . [T]he trial court granted summary judgment . . . and dismissed the action. . . . [T]his ruling is in error and should be reversed. [¶] . . . [¶]

"[T]he elements of the [exposure] exemption to be proved by the Dental Defendants are detailed and specific. . . . [T]he exemption does not involve showing that the chemical is 'safe,' or has not caused harm to individuals, or is recommended by various agencies. Rather, the Dental Defendants were required (1) to present evidence to prove the NOEL for mercury, (2) to present evidence to prove the exposure to mercury from dental amalgam, and (3) to prove that the exposure to mercury from dental amalgam was one thousand times below the NOEL.

"As is evident from the record, the Dental Defendants failed to submit evidence to meet even a single element of the exemption. They did not perform a quantitative risk assessment and did not provide any evidence whatsoever that established the NOEL for mercury. The only evidence relied on, the one-page declaration of [Dr. Amendola], says nothing about the NOEL for mercury . . . . [¶] . . . [¶]

"Consumer Cause met its burden of alleging the elements of its *prima facie* case—that the Dental Defendants knowingly and intentionally exposed individuals to mercury, a listed reproductive toxin, without providing a warning. The Dental Defendants did not challenge this *prima facie* case. Instead, they asserted an affirmative defense and argued that the exposure met the [statutory] exemption . . . because it was one thousand times below the NOEL.

"[T]he Dental Defendants failed to introduce even a shred of evidence to prove any element of this affirmative defense. Thus, contrary to the arguments presented by the Dental Defendants, Consumer Cause had no further burden and was not required to provide any evidence to refute the defense.

"Furthermore, it is irrelevant that Consumer Cause admitted in discovery that it [(1)] had no contention about the *level of* exposure to mercury from dental amalgam, and [(2)] had no contention that exposure at one thousand times the level in question would result in observable effects. While it is correct that a moving party may obtain summary judgment if it proves that the plaintiff has no evidence concerning an 'essential element' of its case . . . , neither of these [two] issues were elements of Consumer Cause's *prima facie* case. Consumer Cause was only required to prove a knowing and intentional exposure without a warning. . . . It did so. It was not required to have contentions or to present evidence about the NOEL or the exposure level, until the Dental Defendants met their own burden of presenting

evidence . . . that the exposure to mercury from dental amalgam is one thousand times below the NOEL for mercury. . . . Since the Dental Defendants failed to establish the elements of the exemption, Consumer Cause had no further burden in presenting its case." (Italics in original, citations and fn. omitted.)

In sum, defendants failed to make an adequate showing that the exposure exemption applied. It follows that the burden of production did not shift to Consumer Cause to raise a disputed issue with respect to the exemption. Thus, this is not a case where "[the] party moving for summary judgment . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination . . . ." (*Aguilar, supra,* 25 Cal.4th at p. 855.) Regardless of the evidence that Consumer Cause could, or did, offer, the *lack of evidence submitted by defendants* was fatal to summary judgment.

C. *Unfair Competition Law*\*

. . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed and the order striking plaintiff's prayer for restitution is affirmed. Plaintiff is entitled to costs on appeal.

Spencer, P. J., concurred.

**VOGEL (MIRIAM A.), J.,** Dissenting.[1]—According to the majority opinion, lawsuits under Proposition 65 can be filed and prosecuted by any person against any business based on bare *allegations* of a violation unsupported by any evidence of an *actual* violation—or even a good faith belief that a defendant is using an unsafe amount of a chemical known by the state to cause cancer or reproductive toxicity.[2] Unconcerned about the practical effect of their decision, and undeterred by a plaintiff's admission that it has

---

\*See footnote, *ante,* page 454.

[1]Since I would affirm the summary judgment on the grounds stated in this dissent, I do not reach the additional issue discussed by the majority in the unpublished portion of the majority opinion.

[2]My references to "safe" and "unsafe" amounts of listed chemicals are strictly a matter of convenience. As explained in more detail below, the statute speaks in terms of amounts that do or don't have an observable effect assuming exposure at 1,000 times the level in question (a phrase that itself needs further definition). In his amicus curiae brief filed in this case, the Attorney General says the term "no observable effect" is a "scientific concept referring to the level of exposure to a chemical that was tested in a given scientific experiment and not found

no evidence at all to suggest that the defendant is using an unsafe level of any listed chemical, my colleagues have endorsed and encouraged a form of judicial extortion.

Here is how it works (it certainly appears to be what was done in this case). Pick a dentist or doctor, any dentist or doctor (but preferably one with a deep pocket).[3] Visit the dentist's or doctor's office. If you don't see Proposition 65 warning signs on the walls or counters, go to the nearest courthouse, file a complaint, allege a failure to warn, and ask for $2,500 for each day the dentist or doctor has failed to give the required warnings. Don't be concerned when the dentist or doctor answers and alleges as an affirmative defense that he is exempt from the warning requirements because he uses only trace amounts of the chemical, and certainly not enough so that anyone's exposure to the chemical is 1,000 times the level that will result in an observable effect. Don't worry when the dentist or doctor sends you some interrogatories and requests for admissions—go ahead and admit that you have no evidence about the level of the chemical he uses (and thus no reason to believe that he is in violation of the law), and admit that you do not contend that exposure at the level used by the dentist or doctor will result in any observable effect.

The dentist or doctor won't be able to get out of the case by a motion for summary judgment based on your admissions. Instead, he'll have to commission an "assessment" to prove that his level of use is safe, and he will have to pay for the kind of "assessment" done by the State of California when it determines that a chemical should be added to the Proposition 65 list. How many thousands of dollars will that cost? I don't know, but I do know that, whatever the cost, the end product will not guaranty a judgment for the defense. What's a dentist or doctor to do? Settle with the plaintiff, of course. Save the cost of the assessment. Save the legal fees. Get rid of the case.

I'm not making this up. My colleagues did. And they can't blame the electorate or the Legislature. Although the statute presumes that warnings are required whenever a listed chemical is used, and although the burden is on the defendant to prove that he is entitled to rely on the exemption from the warning requirement when only safe amounts of a listed chemical are used, the statutory scheme has another requirement ignored by my colleagues—that, to survive summary judgment, the plaintiff must have at least

to create a toxic effect in a statistically significant number of instances. It cannot be equated with the level at which no harm would occur to humans in normal use." I express no view about what is actually safe or unsafe, but sometimes use those phrases as shorthand references to the exposures that do and don't require warnings.

[3]It just so happens that this case was brought against dentists. Keep in mind that other service providers are equally good targets.

a good faith belief that the defendant is using an unsafe amount of a listed chemical.

As the following discussion will show, the result reached by the majority is just plain wrong.

## A.

Consumer Cause's First Amended Complaint:[4] Reduced to its essence, the first amended complaint alleges that SmileCare, while filling teeth and removing old fillings, has knowingly and intentionally exposed its patients and employees to "amalgams contain[ing] mercury and mercury compounds" known to the state to cause reproductive (developmental) toxicity without "first giving clear and reasonable warning" to SmileCare's patients and employees. (Health & Saf. Code, § 25249.6; Cal. Code Regs., tit. 22, § 12000, subds. (b), (c).)[5] Implicit in this allegation is the assumption that SmileCare is obligated by law to give "reasonable warning" to its patients and employees.[6]

SmileCare's Answer to the First Amended Complaint: SmileCare generally denied Consumer Cause's allegations and alleged as an affirmative defense that its "actions were permissible" under section 25249.10, subdivision (c).

---

[4]Consumer Cause's operative pleading (its first amended complaint) alleged that SmileCare exposed its patients and employees to "methylmercury compounds" known to cause cancer as well as reproductive toxicity. On this appeal, Consumer Cause concedes that SmileCare does not use either "methyl mercury" or "methylmercury compounds," and that the "mercury and mercury compounds" that are used by SmileCare are not "chemicals known to the State to cause cancer." (Cal. Code Regs., tit. 22, § 12000, subd. (a).)

[5]Undesignated section references are to the Health and Safety Code, and undesignated regulation references are to title 22 of the California Code of Regulations.

[6]The warning requirement is found in section 25249.6: "No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual, except as provided in Section 25249.10." Regulation 12000, subdivision (a), explains that the list of chemicals known to the State to cause cancer or reproductive toxicity is updated at least once per year, and the list shows the initial date on which each chemical appeared on the list. In light of Consumer Cause's concession that SmileCare does not use a cancer-causing chemical, the relevant listing is found in subdivision (c) of regulation 12000, which divides a list of "[c]hemicals known to the state to cause reproductive toxicity" into three categories, those that cause (1) "[d]evelopmental toxicity," (2) those that cause "[f]emale reproductive toxicity," and (3) those that cause "[m]ale reproductive toxicity." (Reg. § 12000, subd. (c).) Since July 1, 1990, "mercury and mercury compounds" have been included in the developmental toxicity list, but no form of mercury is included in the female or male reproductive toxicity lists. (*Ibid.*) As SmileCare points out, section 25249.6 "precludes businesses from knowingly and intentionally exposing individuals to chemicals known to the state to cause cancer or reproductive toxicity unless a warning notice is first given (in which case you may expose people to the chemicals all you want, subject to someone actually being injured)."

B.

### 1. *The Statutory Exemption*

Subdivision (c) of section 25249.10 provides that warnings are not required when "the person responsible can show that the exposure poses no significant risk assuming lifetime exposure at the level in question for substances known to the state to cause cancer, and that the exposure will have no observable effect assuming exposure at [1,000] times the level in question for substances known to the state to cause reproductive toxicity . . . . *In any action brought to enforce [the warning requirement], the burden of showing that an exposure meets the criteria of this subdivision shall be on the defendant.*" (Italics added.) The parties agree that, as to substances known by the state to cause reproductive toxicity, warnings are required when the exposure is to an amount sufficient to have an *observable effect* assuming exposure at 1,000 times the level in question.[7]

### 2. *The Regulations Governing the Exemption*

In the context of this case, the "level in question" means the chemical concentration of mercury for the "exposure in question." The "exposure in question" includes the exposure for which SmileCare is responsible, and does not include exposure to mercury from any other source or product. (Reg. § 12821, subd. (a).) The "level of exposure" to mercury is determined by "multiplying the level in question (stated in terms of a concentration of a chemical in a given medium) times the reasonably anticipated rate of exposure for an individual to a given medium. The reasonably anticipated rate of exposure shall be based on the pattern and duration of exposure that is relevant to the reproductive effect which provided the basis for the determination that a chemical is known to the state to cause reproductive toxicity. . . ." (Reg. § 12821, subd. (b).)

Unless more specific and scientifically appropriate data are available, specified "assumptions" are used "to calculate the reasonably anticipated rate of exposure" to mercury. (Reg. § 12821, subd. (c).) By way of example,

---

[7]In this context, "expose" means "to cause to ingest, inhale, contact via body surfaces or otherwise come into contact with a chemical. An individual may come into contact with a chemical through water, air, food, consumer products and any other environmental exposure as well as occupational or workplace exposures." (Reg. § 12201, subd. (f).) A "consumer products exposure" is an exposure that "results from a person's acquisition, purchase, storage, consumption, or other reasonably foreseeable use of a consumer good, or any exposure that results from receiving a consumer service." (Reg. § 12601, subd. (b).) An "occupational exposure" is an exposure to any employee "in the workplace of the employer causing the exposure." (Reg. § 12601, subd. (c).) If required, a warning may be given in the manner described in the regulations—primarily by labels and signs. (Reg. § 12601.)

for an exposure reasonably expected to affect "the conceptus (embryo or fetus), the gestation period for the exposed conceptus is nine months." (Regs. §§ 12821, subd. (c)(1), 12721, subd. (d)(2)(B).) By way of another example, "[w]here a maternal exposure to a listed reproductive toxicant has an effect on the conceptus (embryo or fetus), the level of exposure shall be based on the reasonably anticipated rate of exposure for the mother during the nine-month gestation period." (Reg. § 12821, subd. (c)(3).)

"The determination of whether a level of exposure to [mercury] has no *observable effect* [for purposes of determining that warnings are not required] shall be based on evidence and standards of comparable scientific validity to the evidence and standards which form the scientific basis for the listing of a chemical known to the · state to cause reproductive toxicity. *Nothing in* [*the regulations covering "observable effect levels"*] *shall preclude a person from using evidence*, standards, assessment methodologies, principles, assumptions or levels not described in [these regulations] *to establish that a level of exposure has no observable effect at . . . 1,000*[] *times the level in question.*" (Reg. § 12801, subd. (a), italics added.) Since mercury is not included in any of the regulations that identify the levels at which chemicals have no observable effect, it appears that a "quantitative risk assessment" is the anticipated method to determine the level of exposure that has no observable effect. (Regs. §§ 12801-12821.) The "quantitative risk assessment" must be "based on evidence and standards of comparable scientific validity to the evidence and standards which form the scientific basis for listing the chemical as known to the state to cause reproductive toxicity." (Reg. § 12803, subd. (a).) Four pages of squint-print explain how and by whom a chemical gets on the list in the first place. (Regs. §§ 12301-12306.)

This is the way the "observable effect level" is explained in Appendix A to the Regulations: For reproductive toxicants, "a warning is not required if the business can demonstrate that the exposure will produce no observable effect, even at 1,000 times the level in question. In other words, the level of exposure must be below the 'no observable effect level (NOEL),' divided by a 1,000-fold safety or uncertainty factor. The 'no observable effect level' is the highest dose level which has not been associated with an observable adverse reproductive or developmental effect." (Regs. appen. A.)

### 3. *The Attorney General's Explanation of the Regulations*

This is the way the Attorney General puts it in his amicus curiae brief: "The regulations . . . give substance to the . . . exemption and provide guidance for determining whether a level of exposure to a listed chemical has 'no observable effect' for purposes of the exemption. *This is a highly*

*technical, scientific inquiry, and is not the same as presenting anecdotal evidence that a product is 'safe' under some other standard.* Thus, in order for the defendant to meet the exemption, it must first calculate the 'no observable effect' level ('NOEL'). The regulations define the NOEL as the 'maximum dose level at which a chemical has no observable reproductive effect' . . . , and provide a methodology for calculating the NOEL that is deemed sufficient to meet the regulatory requirements: [Fn. omitted.]

"1. The defendant must perform a *quantitative risk assessment* that meets the standards described in [the regulations] to determine the maximum dose level having no observable effect assuming exposure at [1,000] times the level in question.

"2. The quantitative risk assessment must be based on studies producing the reproductive effect which provides the basis for the listing. Where multiple studies exist, the NOEL must be calculated from the studies which produce the lowest NOEL. The NOEL is the highest dose level which results in no observable effect, 'expressed in milligrams of chemical per kilogram of bodyweight per day.' [Citation.]

"3. If the assessment is based on epidemiological data, it must be evaluated for quality and suitability of data to determine whether it is an appropriate basis for assessment. [Citation.]

"4. If the assessment is based on animal bioassay studies, the studies must meet the generally accepted scientific principles relating to experimental protocol, manner of exposure, temporal exposure pattern, duration, etc. [Citation.]

"5. The NOEL must be based on the most sensitive study of sufficient quality. [Citation.]

"6. The NOEL must be converted to a milligram (or microgram) per day dose level by multiplying the assumed human body weight by the NOEL. [Citation.]

"Once the defendant has established the NOEL consistent with the regulations, the defendant must then complete the second portion of the risk assessment and prove, through competent scientific evidence, the individual's daily exposure to the listed substance from the product at issue. *Again, this is a highly technical, scientific determination.* [The Regulations state] that the level of exposure 'shall be determined by multiplying the level in question (stated in terms of a concentration of a chemical in a given

medium) times the reasonably anticipated rate of exposure for an individual to a given medium.' [Citation.] Certain assumptions are to be used in calculating the reasonably anticipated rate of exposure. [Citation.] These include assumptions about the amount of air that people breathe, the amount of water they drink, the normal gestation period, etc. [Citation.] The regulatory assumptions must be used unless 'more specific and scientifically appropriate data are available.' [Citation.]

"At the conclusion of this quantitative risk assessment process, the defendant will have calculated the NOEL and the exposure in question, and can determine whether the exposure in question is [1,000] times below the NOEL and therefore does not require a warning.

"While the regulations specifically state that they are not exclusive, and nothing prohibits a person from using alternative evidence, standards, assessment, methodologies, principles, assumptions or levels to prove that a level of exposure is [1,000] times below the NOEL [citation], the statute makes clear that the question is not one of anecdotal 'safety,' but one of hard science, requiring both the calculation of a NOEL and an exposure level. In performing these calculations, the party advancing the evidence must rely on 'evidence and standards of comparable scientific validity to the evidence and standards which form the scientific basis for the listing of such chemical. [Citation.] *Thus, the ability to deviate from the regulatory method for calculating the NOEL and the exposure is limited.*" (Most italics added.)

## C.

The Requests for Admissions: SmileCare propounded four requests for admissions to Consumer Cause, two of which were answered with admissions. As a result, Consumer Cause has admitted (1) that Consumer Cause "has no evidence that [SmileCare] caused injury to any individuals by exposing individuals to mercury," and (2) that Consumer Cause "has no evidence concerning the level of mercury to which [SmileCare] allegedly exposed individuals."[8]

The Interrogatories: SmileCare propounded eight special interrogatories to Consumer Cause. Some were answered, others were not. As relevant, these are the questions and answers:

[8]There were two other requests for admissions but Consumer Cause refused to admit or deny either statement, asserting that it lacked sufficient information to do so. The first asked Consumer Cause to admit "that a lifetime of exposure to mercury at the level [Consumer Cause] contend[s that SmileCare has] exposed individuals to does not pose a significant risk of causing cancer in the individuals." The second asked Consumer Cause to admit "that exposure to mercury at [1,000] times the level [Consumer Cause] contend[s SmileCare has] exposed individuals to will have no observable effect on the individuals."

"Do you contend that exposure to mercury at [1,000] times the level you believe [SmileCare has] exposed individuals to will result in observable effects to the individuals?" *Consumer Cause's answer was "No."*

When asked to "[i]dentify all facts[, documents, and individuals with information] regarding the level of mercury to which [Consumer Cause] claim[s that SmileCare has] exposed individuals," Consumer Cause responded with a statement that it had "made no allegation regarding the level of mercury to which [SmileCare has] exposed individuals. Therefore, [Consumer Cause] is not in possession of such facts."[9]

---

[9]That these discovery responses are as damning as SmileCare claimed in its motion for summary judgment is shown by the Attorney General's suggestion that a "more sophisticated plaintiff" might have responded differently. I do not believe a plaintiff's sophistication or lack of it permits a court to disregard the party's discovery responses. More to the point, I do not agree with the Attorney General's characterization of Consumer Cause as an unsophisticated plaintiff. (See, e.g., <http://www.mckennaccuneo.com/articles/article_detail.cfm?126> [as of Aug. 9, 2001] [a law firm's "client alert" warning that a "Proposition 65 'bounty-hunter' plaintiff known as Consumer Cause, Inc." had issued notices of intent to sue against the manufacturers and distributors of 77 medical devices, and describing Consumer Cause as "a prolific bounty-hunter plaintiff, having filed over a hundred Notices of Intent to Sue regarding a wide range of consumer products. Consumer Cause also has brought suit [under Proposition 65] against most of the major petroleum refiners and distributors doing business in California . . . . [¶] [Some of these notices] include an 'Invitation to Confer,' in which counsel explains what Consumer Cause 'seeks to gain' by these Notices. Their objectives include creating a 'channel of communication' to resolve the matter 'without litigation,' a 'small penalty . . . or contribution,' and an additional payment to 'compensate' the attorneys"]; <http://www/calprop65.devices.html> [as of Aug. 9, 2001] [describing a March 1999 incident in which Consumer Cause sent 60-day notices to over 300 companies, alleging failures to warn about 22 listed chemicals in 76 different implanted medical devices, and an April 2000 case in which Consumer Cause "settled" a "nickel exposure" case involving penile implants for $50,000, with half denominated a "donation" to Consumer Cause, the other half as payment for Consumer Cause's attorneys' fees]; see also <http://www.calprop65.com/filings01.html> [as of Aug. 9, 2001] [a 10-page list of cases pending as of July 20, 2001, with at least a dozen in which Consumer Cause is the plaintiff;] <http://www.mccutchen.com/are/env/env_prop65_unchartered.html> [as of Aug. 9, 2001] ; and see *Equilon Enterprises v. Consumer Cause, Inc.* (2000) 85 Cal.App.4th 654 [102 Cal.Rptr.2d 371] [as of Aug. 9, 2001], review granted Apr. 11, 2001, S094877; *Yeroushalmi v. Miramar Sheraton* (2001) 88 Cal.App.4th 738 [106 Cal.Rptr.2d 332].)

As should be obvious, I used the Internet to determine whether Consumer Cause is as unsophisticated as claimed by the Attorney General. But it may not be quite as obvious that the first six pages of the majority opinion are the product of the same kind of independent investigation—*none* of the "facts" concerning the debate about dental amalgam fillings are in evidence, none were discussed in the parties' briefs. None of these "facts" have anything to do with the burden of proof issue before us, or with Consumer Cause's ability to understand a straightforward interrogatory, or with its lawyer's ability to object to an interrogatory as "ambiguous" if it cannot fairly be answered one way or the other.

## D.

SmileCare's Motion for Summary Judgment and Separate Statement. SmileCare moved for summary judgment on the ground that it is exempt from the warning requirements, as admitted by Consumer Cause in its responses to SmileCare's requests for admissions and interrogatories. More specifically, SmileCare relied on Consumer Cause's answer to the interrogatory that asked, "Do you contend that exposure to mercury at [1,000] times the level you believe [SmileCare has] exposed individuals to will result in observable effects to the individuals?" As noted above, Consumer Cause answered, "No." The interrogatory and the answer are cited in SmileCare's separate statement in support of the admitted fact and the logical conclusion—that Consumer Cause's failure to contend that SmileCare's use of mercury results in observable effects means that SmileCare is not required to give any Proposition 65 warnings.[10] In its opposition to SmileCare's motion, Consumer Cause simply ignored its discovery responses. In its responding separate statement, Consumer Cause *admitted* that it had no evidence to suggest that SmileCare's use of mercury results in observable effects assuming exposure at 1,000 times the level it is used by SmileCare, and disputed the issue solely on the ground that (in Consumer Cause's view) SmileCare had not met its burden of proof.[11]

The majority finds it significant that SmileCare concedes its use of mercury and concedes that it has not presented scientific proof that its use of mercury does not result in observable effects assuming exposure at 1,000 times the level it is used. My colleagues miss the point. SmileCare's position is that, assuming its use of a listed chemical, it is exempt from the warning requirements *because Consumer Cause does not contend otherwise. Since Consumer Cause admitted in response to SmileCare's interrogatory that it does not contend "that exposure to mercury at [1,000] times the level [Consumer Cause] believe[s SmileCare has] exposed individuals to will result in*

---

[10]Because the discovery responses are specifically cited in SmileCare's separate statement, I am at a loss to understand the majority's reliance on my opinion in *United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 337 [282 Cal.Rptr. 368], a case where the facts relied on were *not* included in the separate statement.

[11]When Consumer Cause responded to SmileCare's interrogatories and requests for admissions, Consumer Cause knew (by way of SmileCare's answer) that SmileCare claimed exemption under section 25249.10, subdivision (c). Knowing that, Consumer Cause said it does not contend that SmileCare's use of mercury defeats SmileCare's reliance on the exemption. For this reason, I cannot understand my colleagues' refusal to hold Consumer Cause to its admission. As SmileCare puts it: "If a plaintiff sued a defendant for negligence, plaintiff would have the burden of proof to establish negligence. But if plaintiff served defendant with an interrogatory asking defendant if it contends defendant was not negligent, and defendant replied, 'No,' defendant would be conceding that as soon as plaintiff makes any kind of prima facie showing of negligence, liability is established without opposition. That is exactly what happened here. Plaintiff admitted it had no evidence to rebut the Section 25249.10[, subdivision] (c) defense, and did not even contend that the defense did not apply."

*observable effects to the individuals," SmileCare's affirmative defense—that it is entitled to rely on the "observable effects" exemption—is not disputed.*

1.

I agree generally with the majority's statement of the burden of proof rule in the context of this case. Simply put, when a defendant moves for summary judgment based upon an affirmative defense, the defendant has the initial burden of production—that is, to make a prima facie showing in support of its affirmative defense, which can be done with declarations, admissions, answers to interrogatories, other discovery responses, and matters about which judicial notice can be taken. Once that is done, the burden shifts to the plaintiff to present evidence sufficient to create a triable issue of fact as to the affirmative defense relied on by the defendant. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849-855 [26 Cal.4th 80a, 107 Cal.Rptr.2d 841, 24 P.3d 493].)

I part company with my colleagues when it comes to the application of these rules to this case. In my view, SmileCare met its burden. It presented the declaration of Louis J. Amendola, D.D.S., attesting to the fact that SmileCare uses standard dental amalgams with "trace amounts of mercury," the most widely used fillings in the United States for 150 years, fillings that are approved and recommended as safe by the American Dental Association. SmileCare also presented Consumer Cause's discovery responses in which Consumer Cause admitted (1) *that it had no evidence concerning the level of mercury to which SmileCare exposed anyone* and (2) that it *does not contend* that exposure to mercury at 1,000 times the level used by SmileCare will result in observable effects to the individuals. In my view, these are admissions that SmileCare is exempt under subdivision (c) of section 25249.10— because it is undisputed that the exposure at issue will have no observable effect assuming exposure at 1,000 times the level in question.

With that showing, I believe the burden shifted to Consumer Cause to present *some* evidence showing at least a *reasonable belief* that the level used by SmileCare does have an observable effect assuming exposure at 1,000 times the level in question. I am *not* suggesting that, contrary to section 25249.10, subdivision (c), the burden is on a plaintiff to show that the levels of exposure are sufficiently high to require warnings. (§ 25249.10, subd. (c) [in any action brought to enforce the warning requirement, "the burden of showing that an exposure [is exempt] shall be on the defendant"].) But I am most definitely suggesting that, before putting every random dentist and

doctor in California to the extraordinary expense involved in preparing the "assessment" required to prevail in this kind of lawsuit, we ought to require something more than the plaintiff's naked assertion of an absolute right to engage in this kind of litigation.

2.

The statute and the regulations support this approach.

Regulation 12801, subdivision (a) (which says the determination whether a level of exposure to mercury has no observable effect shall be based on evidence and standards of comparable scientific validity to the evidence and standards which form the scientific basis for the listing of a chemical known to the state to cause reproductive toxicity) also provides that *nothing in the regulations covering observable effect levels precludes a person from using evidence or assumptions* other than those described in the regulations to establish that a level of exposure has no observable effect at 1,000 times the level in question. Here, for purposes of summary judgment, SmileCare has used Consumer Cause's admissions that it does not contend that the level of exposure at 1,000 times the exposure in question will result in observable effects, and that it has no evidence concerning the levels at issue as *evidence* corroborating the dentist's testimony that only trace amounts are used. The *assumption,* for purposes of summary judgment, ought to be that Consumer Cause has no reasonable belief that SmileCare has violated the letter or the spirit of Proposition 65.

The "notice" requirements lend further support to my interpretation of this statutory scheme. Section 25249.7, subdivision (d)(1), permits any person acting in the public interest to bring an action to enforce the warning requirements—provided that notice has first been given to the Attorney General and other prosecutors with jurisdiction. Regulation section 12903 sets out the specific content of the required notice, including (in this context) the route of exposure by which exposure is alleged to occur (e.g., by inhalation, ingestion, dermal contact), the name of the consumer product or service, and the identity of the regulated chemical. But the notice need *not* contain "the level of exposure to the chemical in question" or the "specific admissible evidence by which the person providing the notice *will attempt to prove the violation.*" (Reg. § 12903, subd. (b)(4)(B)-(C), emphasis added.) Quite plainly, the electorate and the rulemakers assume that, at some point in these proceedings, it is the plaintiff who must, at a minimum, *attempt to prove the violation.* Given that fact, I believe that, based on the showing made by SmileCare in support of its motion for summary judgment, Consumer Cause's inability to say that it has so much as a good faith belief that

SmileCare is *not* exempt requires an affirmance of the summary judgment granted by the trial court.

To conclude otherwise is to give Consumer Cause the right to pick its defendants out of a hat and, without even a suspicion of liability, require *them* to prove that they are *not* violating the law—that is, to shoot holes in the side of a barn, then draw circles around them.[12] Since that result will do nothing more than line Consumer Cause's pockets with money extorted from dentists and others who will then be forced to raise their fees, I cannot believe that was the voters' intent when Proposition 65 was adopted.

I would affirm the summary judgment.

A petition for a rehearing was denied August 21, 2001.

---

[12]For anyone who doesn't know the parable, it can be found in a number of books, including John Allen Paulos's, Once Upon a Number, The Hidden Mathematical Logic of Stories (Basic Books 1998) page 17: "A bookish, somewhat nerdy man is telling his kids the Leo Rosten story about the famous rabbi who was asked by an admiring student how it was that the rabbi always had a perfect parable for any subject. The rabbi replied with a parable about a recruiter in the Tsar's army who was riding through a small town and noticed dozens of chalked circular targets on the side of a barn, each with a bullet hole through the bullseye. The recruiter was impressed and asked a neighbor who this perfect shooter might be. The neighbor responded, 'Oh that's Shepsel, the shoemaker's son. He's a little peculiar.' The enthusiastic recruiter was undeterred until the neighbor added, 'You see, first Shepsel shoots and *then* he draws the chalk circles around the bullet hole.' The rabbi grinned. 'That's the way it *is* with me. I don't look for a parable to fit the subject. I introduce only subjects for which I have parables.' "