Filed 2/4/15  Montiel CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SARITA MONTIEL, | D065443 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2010-00094241-CU-WT-CTL) |
| PATENAUDE & FELIX, APC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joan M. Lewis, Judge.  Affirmed in part, reversed in part, remanded with directions.

Keegan & Baker and Brent Jex for Plaintiff and Appellant.

Paul, Plevin, Sullivan & Connaughton, J. Rod Betts and Michael J. Etchepare for Defendants and Respondents.

Sarita Montiel, an employee of Patenaude & Felix, APC (P&F), sued P&F and William Nelson (Nelson and P&F, together Respondents) alleging several causes of action under the California Fair Employment and Housing Act (Gov. Code, § 12900 et

seq.;[1] FEHA) as well as other claims, including battery and intentional infliction of emotional distress. The superior court entered judgment for Respondents after granting their motion for summary judgment. Montiel appeals the judgment.

We determine that summary adjudication was proper as to all but one of Montiel's claims. Montiel has raised a disputed issue of material fact in regard to her battery claim. As such, we reverse the judgment as to that claim only and remand this matter for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

P&F is a law firm, managed by Raymond Patenaude, representing clients in litigation and recovery of unpaid consumer debt. P&F hires legal account representatives to contact debtors and obtain payment. Collection teams are supervised by a team lead, and the firm has an assistant collections manager, collections manager, and attorneys.

P&F has a policy prohibiting harassment, discrimination, and retaliation in the workplace. P&F also has a policy that prohibits workplace violence: "Acts or threats of physical violence, including intimidation, harassment, and/or coercion, that involve or affect P&F or that occur on P&F property or in the conduct of P&F business off P&F property, will not be tolerated . . . . Violations of this policy, by any individual, will lead to disciplinary and/or legal action as appropriate."

P&F hired Nelson in 2001, promoted him to assistant collections manager in 2004, and to collections manager in 2009.

---

[1] Statutory references are to the Government Code unless otherwise specified.

2

P&F hired Montiel as a legal account representative in 2006, and she was assigned to the "Target Team," resolving debt for Target Corporation. Montiel reported to team lead David Jauregui, who reported to assistant collections manager Robert Merrigan, who reported to Nelson.

Montiel claims Nelson engaged in a variety of unwanted conduct in 2009 and 2010. He massaged her shoulders, touched her inappropriately, flirted with her, asked her to kiss him on the cheek, and stared at her. She also claims some conduct (including more unwanted touching, attempts to kiss Montiel in an elevator, and pushing up against her) may have occurred in 2011, but she does not specify any actual dates, not even the month any of the actions occurred. Montiel admits this alleged conduct "slowed down" in 2011, and states Nelson allegedly shifted attention to a different employee at that time.

Montiel reported Nelson's alleged conduct to P&F in January or February 2011, when she made an oral complaint to Danielle Warner, human resources manager. It is unclear from the record what Montiel told Warner Nelson was doing. Although Warner generally requested employees to make written complaints, Montiel did not do so in regard to Nelson.

On March 29, 2011, Montiel complained to Warner that her supervisors would stand behind her and listen to her phone calls. Montiel also complained to Patenaude, stating she just needed to "vent" and was upset with her supervision. Despite these complaints, Montiel praised P&F, and stated "I love working here I think you [Patenaude] are a good boss and you know I like you . . . ." Montiel did not mention concerns about Nelson or any sexual harassment. Montiel also spoke to Nelson regarding

3

her issues with the supervision. Montiel thanked Nelson for meeting with her and Nelson responded by telling Montiel she was "a great collector and a great person."

On April 6, 2011, Montiel alleges she was talking to a male coworker (Keith Austin) regarding eating sweets. Merrigan overhead the conversation and allegedly said, "It's going to all the right places." Montiel complained and Warner set up a meeting the same day to investigate. Montiel later thanked Warner for "making [her] feel comfortable" during the meeting. On April 12, 2011, Montiel told Warner she wanted to drop the complaint. Warner still investigated, including interviewing Merrigan and Austin, but could not verify the statement was made. Both Merrigan and Austin denied the incident completely.

On May 3, 2011, Nelson overheard Montiel yelling at Jauregui because Jauregui was moving Montiel's desk next to his. As part of P&F's regular procedure of monitoring employee phone calls for legal compliance, Montiel had been observed making personal phone calls during work hours in violation of company policy, and Jauregui wanted her to move next to him to monitor the issue. When Nelson intervened, Montiel threatened him, stating she had spoken to her attorney and Nelson was "going down," he needed to "watch his back," and she had "shit on [him]." Nelson reported the threats to Warner and Patenaude.

Montiel e-mailed Patenaude and complained she did not like the way Nelson spoke to her about the incident, and he should have taken her into a private office to discuss the situation. Patenaude met with Montiel, but she did not report any sexual harassment. Montiel thanked Patenaude for meeting and apologized to Nelson via

4

e-mail, stating she did not want to jeopardize their friendship: "[I don't want] to throw all those yrs [sic] down the drain," and "I JUST FELT LIKE WE WERE SUCH GOOD FRIENDS THAT WHEN U DON'T HAVE MY BACK 100% I GET LIKE THAT BUT I DO UNDERSTAND UR [sic] POSITION . . . ."

On August 3, 2011, Montiel complained she was being "harassed" by coworker Muriely Carter, and Carter was trying to hit coworkers with her car. Warner investigated, but found nothing to substantiate these claims. Montiel complained again on August 11, 2011 that Carter was "talking poop," and Montiel stated "one day it's going to turn another way once I have had it . . . ." Warner facilitated a meeting between Carter and Montiel. During the meeting, Montiel told Carter they should take the matter "to the streets," which Warner and attorney Michael Boulanger, also in attendance, interpreted as a threat. Montiel admitted making the statement. Warner issued written warnings to both Carter and Montiel. Montiel was informed she would be discharged if she engaged in further threatening behavior.

In response, Montiel wrote a resignation e-mail on August 12, 2011. She stated: "I do like my boss [Jauregui] he is a good boss and friend . . . and [Patenaude] you have always been there for me I really like having you as a boss you have always had my back and I love you for that I could always go to you and for some reason you understand me . . . and [Nelson] you have always been there for me and I want to thank you . . . ." Montiel then e-mailed two coworkers and stated "I just quit." However, Montiel did not resign.

On August 17, 2011, coworker Broderick Crawford complained Montiel called him a "terrorist." Warner met with Montiel to discuss the incident. Montiel was extremely defensive, and while Warner assured her the meeting was to get Montiel's side of the story, Montiel became disrespectful, unprofessional, and raised her voice. Given Montiel's behavior and recent warning for threatening a coworker, Warner suspended Montiel for seven days, and issued her a final warning: "P&F cannot have this behavior continue; therefore this is your LAST and FINAL WARNING. [¶] . . . Further, if you are found violating or conducting yourself in a less than professional manner again, you will be terminated immediately."

On September 13, 2011, Montiel e-mailed Warner to report an alleged incident from almost a month earlier, on August 17, 2011, but that Montiel had not previously reported. Montiel claimed Merrigan told her she needed to think with her head. Montiel told Merrigan she thought with her heart, to which he allegedly responded, "And what two big hearts you have." Warner investigated, but was unable to substantiate the complaint. In fact, on the same day Merrigan allegedly made this comment, Montiel e-mailed Merrigan and told him, "I just want to thank you I feel like you're the only one here who has both sides . . . ."

Less than a month after receiving a written warning and seven-day suspension for aggressive behavior, Montiel threatened coworker Milton Jones on September 15, 2011, stating, "I can get you handled." Jones believed the statement, which occurred during an argument, was a threat and reported it to Warner. Carter also overheard the comment and reported it as a threat.

6

Warner promptly interviewed Jones, Carter, and Montiel. Jones and Carter independently corroborated the incident, and Warner substantiated the statement was made and perceived as a threat by multiple employees. Warner immediately telephoned Patenaude, who was out of the office, and informed him of the incident. Patenaude considered the new incident, the two previous incidents, and that Montiel was on a "final warning," and directed Warner to terminate Montiel for repeated violations of P&F's workplace violence policy. Patenaude was the sole decision maker. At the time of the decision, Patenaude was unaware of any alleged harassment complaints by Montiel. Montiel e-mailed Patenaude at 4:32 p.m. on September 15, 2011, complaining about sexual harassment. Patenaude, who was not in the office, apparently did not see the e-mail before making the termination decision. Montiel admits she had either already been informed of the termination or knew termination was imminent when she sent the e-mail.

Warner informed Montiel of the termination, and Montiel threatened Warner, implying she knew where Warner lived.

In response to her termination, Montiel filed suit. In the second amended complaint, which was the operative complaint, Montiel names P&F, Nelson, Patenaude, and Target Corporation as defendants. The complaint contained 13 causes of action: (1) hostile work environment sexual harassment in violation of section 12940, subdivision (j) (against all defendants); (2) quid pro quo sexual harassment in violation of section 12940, subdivision (j) (against all defendants); (3) sex-based discrimination in violation of section 12940, subdivision (a) (against Patenaude & P&F); (4) failure to prevent sexual harassment in violation of section 12940, subdivision (k) (against

7

Patenaude & P&F); (5) unlawful retaliation in violation of section 12940, subdivision (h) (against Patenaude & P&F); (6) wrongful termination in violation of public policy (against P&F); (7) intentional infliction of emotional distress (against Nelson and P&F); (8) battery (against Nelson); (9) failure to engage in interactive process regarding disability in violation of section 12940, subdivision (n) (against Patenaude & P&F); and causes of action 10 through 13, consisting of various alleged Labor Code violations. Montiel dismissed these last four cases of action with prejudice.

Respondents filed a motion for summary judgment, or in the alternative, a motion for summary adjudication, which was supported by evidence and pleadings, including a separate statement of undisputed material facts. Montiel filed an opposition that was supported by evidence and pleadings, including her response to Respondents' separate statement of disputed facts as well as her separate statement of undisputed facts. Respondents filed a reply in support of their motion for summary judgment and objected to some of the evidence submitted by Montiel in support of her opposition to the motion for summary judgment.

After hearing oral argument and considering the pleadings and evidence, the court granted the motion for summary judgment. In doing so, the court sustained 22 of 25 evidentiary objections made by Respondents. The court subsequently entered judgment in favor of Respondents.

Montiel timely appealed.

## DISCUSSION

Montiel claims the superior court committed reversible error in granting Respondents' motion for summary judgment. Specifically, she contends: (1) the superior court erred when it found Montiel had not presented evidence that the reason for her termination was pretextual; (2) Respondents did not carry their burden in establishing a statute of limitations defense as to the first two causes of action; (3) her complained of conduct was sufficiently severe and pervasive to alter her terms and conditions of employment; (4) there was sufficient evidence of quid pro quo harassment; (5) there was adequate evidence that P&F failed to engage in an interactive process; (6) her claim of battery was not subject to the workers' compensation exclusivity rules; and (7) the fourth and seventh causes of action should have survived summary judgment.

## I

### *THE MOTION FOR SUMMARY JUDGMENT*

#### A. Standard of Review

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers, except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).) Generally, if all the papers submitted by the parties show there is no triable issue of material fact and the "moving party is entitled to a judgment as a matter of law" (Code Civ. Proc., § 437c, subd. (c)), the court

9

must grant the motion for summary judgment.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)[2]

In performing our independent review, we apply the same three-step process as the trial court.  "Because summary judgment is defined by the material allegations in the pleadings, we first look to the pleadings to identify the elements of the causes of action for which relief is sought."  (*Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 159 (*Baptist*).)

"We then examine the moving party's motion, including the evidence offered in support of the motion."  (*Baptist*, *supra*, 143 Cal.App.4th at p. 159.)  A defendant moving for summary judgment has the initial burden of showing that a cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action.  (Code Civ. Proc., § 437c, subd. (o); *Aguilar*, *supra*, 25 Cal.4th at p. 850.)

If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied.  However, if the moving papers make a prima facie showing that justifies a judgment in the defendant's favor, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable

---

[2]   There is some confusion whether the superior court ruled on Respondents' motion as a motion for summary judgment or a motion for summary adjudication.  This distinction, however, does not matter for purposes of our review.  We review rulings on motions for summary judgment and summary adjudication de novo, applying the same rules and procedures.  (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819; *Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1726-1727.)

issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, *supra*, 25 Cal.4th at p. 849; *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1002-1003.)

In determining whether the parties have met their respective burdens, "the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citations], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party." (*Aguilar*, *supra*, 25 Cal.4th at p. 843.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id*. at p. 850, fn. omitted.) Thus, a party "cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact." (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.)

## B. Respondents' Objections to Evidence

Although a review of a judgment following the granting of a summary judgment requires an independent review, "[a] different analysis is required for our review of the trial court's . . . rulings on evidentiary objections. Although it is often said that an appellate court reviews a summary judgment motion 'de novo,' the weight of authority holds that an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard." (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.) Here, the court sustained 22 of Respondents' 25 objections to evidence. It does not appear from the record that Montiel challenged the objections with

11

the superior court. Nor did she argue that court abused its discretion or otherwise erred in sustaining the objections.

Instead, Montiel ignores both the objections and the superior court sustaining the objections and relies on excluded evidence in her opening brief. Further, she omits Respondents' objections from her appendix although she included all other pleadings and evidence filed in support of and in opposition to the motion for summary judgment.

Because Montiel has not challenged the superior court's ruling on these objections, we will not review the court's evidentiary rulings nor will we consider any of the evidence that has been excluded.

### C. Causes of Action Nos. Three, Five, and Six

Montiel contends the superior court erred in finding that she had not presented evidence to create a disputed material fact as to whether P&F's stated reason for her termination was pretextual. Because of this claimed error, Montiel insists her third, fifth and sixth causes of action should have survived Respondents' motion for summary judgment. We disagree.

As a threshold matter, we note that the three causes of action at issue here involve Patenaude's motivation to terminate Montiel's employment. For her third cause of action for sex-based discrimination in violation of section 12940, subdivision (a), Montiel claims she was fired because of her "sex as a woman."[3] To support her fifth cause of

3    Montiel does not attempt to show she was terminated based on her gender. The entirety of her brief argues she was terminated for making complaints, not because she was a woman. To prove gender discrimination Montiel must demonstrate P&F engaged

12

action for unlawful retaliation in violation of section 12940, subdivision (h), Montiel contends she was terminated for engaging in protected conduct (reporting sexual harassment). And, for her sixth cause action for wrongful termination in violation of public policy, Montiel insists she was fired for complaining about being harassed.

For causes of action based on FEHA like these, "California has adopted the three-stage burden-shifting test established by the United States Supreme Court . . . ." (*Guz*, *supra*, 24 Cal.4th at p. 354.) This approach requires the plaintiff "to establish a prima facie case of [an unlawful employment practice]. . . . [¶] . . . If the plaintiff meets this burden, ' " 'the burden shifts to the defendant to [articulate a] legitimate nondiscriminatory reason for its employment decision. . . .' . . ." ' . . . [¶] . . . [I]f the defendant presents evidence showing a legitimate, nondiscriminatory reason, the burden again shifts to the plaintiff to establish the defendant intentionally [engaged in an unlawful employment practice] against him or her. [Citation.] The plaintiff may satisfy this burden by proving the legitimate reasons offered by the defendant were false, creating an inference that those reasons served as a pretext for [the unlawful employment practice]." (*Wills v. Superior* Court (2011) 195 Cal.App.4th 143, 159-160 (*Wills*).)

"A defendant's summary judgment motion 'slightly modifies the order of these . . . showings.' [Citation.] Consequently, the [defendant] ha[s] the initial burden to either (1) negate an essential element of [the plaintiff's] prima facie case [citation] or (2) establish a

in the offending conduct because of her gender. (See *Guz*, *supra*, 24 Ca1.4th at p. 358.) Here, there is no evidence of a man being treated more favorably after repeatedly threatening employees. There is simply no evidence Montiel was terminated because she is a woman. For this reason alone, we reject all of Montiel's arguments in support of her third cause of action.

legitimate, nondiscriminatory reason for [the adverse action]. [¶] '[T]o avoid summary judgment [once the employer makes the foregoing showing], an employee . . . must offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in [an unlawful employment practice].' " (*Wills*, *supra*, 195 Cal.App.4th at p. 160.)

"In discrimination cases, proof of the employer's reasons for an adverse action often depends on inferences rather than on direct evidence. . . . [E]ven though we may expect a plaintiff to rely on inferences rather than direct evidence to create a factual dispute on the question of motive, a material triable controversy is not established unless the inference is reasonable. And an inference is reasonable if, and only if, it implies the unlawful motive is more likely than defendant's proffered explanation." (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038.) Also " '[s]peculation cannot be regarded as substantial responsive evidence.' [Citation.] In order to raise an issue as to the employer's credibility, the employee must set forth specific facts demonstrating ' "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.' " ' " (*Ibid*.; italics omitted.)

### 1. Legitimate Reason for Terminating Montiel

To establish a legitimate reason for disciplinary action, the employer must " 'clearly set forth, through the introduction of admissible evidence, the reasons for the

14

[termination or demotion]. The explanation provided must be legally sufficient to justify a judgment for the [employer].' " (*Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 149.) Here, we find Respondents established a legitimate reason for terminating Montiel's employment. They have provided evidence that during a meeting with Warner and Carter, Montiel threatened Carter. After the meeting, Warner issued a written warning to both Carter and Montiel. Montiel also was informed she would be discharged if she engaged in further threatening behavior. Montiel later called a coworker a terrorist and was suspended for seven days after she became disrespectful, unprofessional, and repeatedly raised her voice during an interview with Warner. Along with her suspension, Warner issued Montiel a final warning: "P&F cannot have this behavior continue; therefore this is your LAST and FINAL WARNING. . . . [¶] . . . Further, if you are found violating or conducting yourself in a less than professional manner again, you will be terminated immediately."

Less than a month after receiving a written warning and seven-day suspension for aggressive behavior, Montiel threatened Jones. Jones reported the threat to Warner. Carter, another coworker, overheard the comment and reported it as a threat.

Warner investigated the manner, including talking to Montiel and determined Montiel had threatened Jones. Warner then telephoned Patenaude and informed him of the incident. Patenaude considered the new incident, the two previous incidents, and that Montiel was on a "final warning," and directed Warner to terminate Montiel for repeated violations of P&F's workplace violence policy.

Based on this evidence, we are satisfied Respondents have shown that Montiel's employment was terminated because she violated P&F's employment policy against workplace violence multiple times, including after she had received a written warning. Violation of an employer's workplace violence policy is a legitimate nondiscriminatory reason for termination. (*Wills*, *supra*, 195 Cal.App.4th at p. 168.)

## 2. *Montiel's Assertion of Pretext*

After the employer articulates a legitimate justification for termination, the employee must prove, by substantial evidence, the reason was pretext for illegal discrimination or retaliation. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1004 (*Scotch*).) Here, Montiel makes three arguments of pretext. First, she argues, in passing, that she did not threaten Jones. Next, she maintains her supervisors threatened her and tried to prevent her from complaining about the harassment. Finally, Montiel insists other employees who made threats were not terminated.

Montiel asserts the superior court erred in finding no evidence of pretext because it is a disputed fact whether she even threatened Jones. She claims that she did not threaten Jones, but, instead, in arguing with Jones after he called her a name, stated, "[Y]ou shouldn't call a woman that. You should talk to a man like that." However, Montiel's reliance on this disputed fact does not carry the day.

An employer does not have to prove its termination decision was correct. Rather, an employer must merely prove it had an honest, good faith belief that termination was warranted based on the facts as it understood them at the time. (*Slatkin v. University of*

16

*Redlands* (2001) 88 Cal.App.4th 1147, 1157.) Thus, an employer's perception, based on the facts revealed during a good faith investigation, form a legitimate basis for the decision even if later called into question. (*Wills*, *supra*, 195 Cal.App.4th at pp. 171-172; *King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 436 ["It is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that is at issue in a discrimination case"].)

In *Wills*, the employer terminated plaintiff for threatening coworkers. (*Wills*, *supra*, 195 Cal.App.4th at p. 151.) In appealing a judgment following a successful motion for summary judgment, Wills argued a triable issue of material fact existed on whether her conduct reasonably could be interpreted as a threat. (*Id*. at p. 171.) The Court of Appeal determined this was not "sufficient to create a triable issue of material fact because the question is not whether Wills's comments and conduct reasonably could be construed as threatening. Rather, the question is whether the [employer] honestly believed Wills violated its written policy against verbal threats, threatening conduct, and violence." (*Id*. at pp. 171-172.) And although Wills did not challenge the content of her alleged threatening statement and Montiel does, we are satisfied, on the record before us, the court's reasoning in *Wills* applies here.

Montiel does not dispute that she threatened Carter. She does not dispute that she was unprofessional and raised her voice when she met with Warner after she called a coworker a terrorist. She merely disputes what she said to Jones was actually a threat. In other words, she disputes the last link in a chain of similar events that lead to Patenaude's decision to terminate her employment. We do not find this argument so dissimilar to the

17

argument Wills proffered to distinguish the instant action from *Wills*, *supra*, 195 Cal.App.4th 143. It is not insignificant to our analysis that Montiel does not give more than superficial treatment to this argument in her opening brief. In her 46-page brief, she devotes one sentence and one footnote to this argument. She does not provide any authority for her position nor does she address the holding of *Wills*. As such, we interpret Montiel's lack of development of this argument to underscore its lack of merit.

Montiel's next claim of pretext is based on her argument that her supervisors threatened her and tried to prevent her from making harassment complaints. Montiel ignores that the people who allegedly "threatened" her employment for making complaints about Nelson played no role in the termination. To state a claim for retaliation, Montiel must show the decision maker was "aware of the protected activities." (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69-70 (*Morgan*).) The supposed retaliatory animus of someone who played no part in the decision is irrelevant. (*Id*. at pp. 72-74.)

*Morgan*, supra, 88 Cal.App.4th 52 is instructive. In that case, the appellant alleged retaliation because supervisors made the following comments: "[I]t was poor judgment for appellant to use the grievance procedure and his doing so was 'probably a detriment' [to his career]; [plaintiff] would never be rehired because he had filed the grievance and . . . 'filing a grievance and the retaliation stuff may come up'; [if he reapplied] it was a waste of [plaintiff's] time to file applications for rehire." (*Id.* at p. 70.)

The court disagreed, noting none of the supervisors were "authorized by [the employer] to speak on the subject they addressed," and none "were involved in the

decisions not to rehire appellant." (*Morgan, supra,* 88 Cal.App.4th at p. 70.)  Nor were the comments "general examples of unlawful company policy" because they were "speculation as to the likely outcome of appellant's job search by individuals who played no role in the decisions regarding that search." (*Id.* at pp. 70-71.)

Here, Montiel complains her supervisors made the following comments: (1) Merrigan stated, "You know, I'm going to tell you something.  If it's between you or Monty, you're going to be the one to go"; (2) Nelson stated, "You used to be like a fixture in [P&F].  You weren't going anywhere"; and (3) Merrigan stated "he would fight fire with fire," and he would "not stand by this time and do nothing."

Yet, in relying on these statements as evidence of pretext, Montiel fails to address the fact that it is undisputed that Patenaude was the sole decision maker in deciding to terminate her employment.  There is no evidence Merrigan, Jauregui, or Nelson played any role in that decision.  Instead, coworkers Jones and Carter reported Montiel's threat to Warner and Warner investigated.  Warner informed Patenaude of her findings by telephone, and Patenaude made the decision, while still on the phone, to terminate Montiel.  The threat, investigation, phone call, termination decision, and termination meeting all occurred on the same day.  There is no evidence that Patenaude solicited input from Merrigan, Jauregui, or Nelson or that they provided any.  Although Montiel alleges several comments by Jauregui, Nelson, and Merrigan, these comments are

19

analogous to the "speculation" from nondecision makers dismissed in *Morgan*, *supra*, 88 Cal.App.4th 52.[4]

Also absent in the record is any indication that Patenaude had knowledge of Montiel's complaints or harbored any animus against Montiel. The correspondence in the record indicated that Montiel and Patenaude enjoyed a good, professional relationship. And the evidence shows that Patenaude decided to terminate Montiel's employment based solely on her threatening conduct in August and September 2011.[5]

Montiel's final argument that she presented sufficient evidence to establish pretext depends on her claim that other employees were not terminated for violations of the workplace violence policy. Specifically, she claims two employees once shoved each other, another employee brought a knife to work, and Carter was an aggressive employee with a 21-year-old felony conviction. Despite these "violations," Montiel asserts none of these employees were terminated. To establish pretext

---

[4]     Montiel for the first time in her reply brief argues that Nelson was involved in the investigation of Montiel's alleged threats and thus played some role in the decision to terminate Montiel. However, we need not address arguments made for the first time in a reply brief. (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894-895, fn. 10.) We also note Respondents filed a motion to strike certain portions of Montiel's reply brief for similar reasons. We deny the motion as moot as we will not consider arguments Montiel first makes in her reply brief.

[5]     Montiel contends Patenaude must have known about the harassment complaint when he made the termination decision because she sent him a complaint at 4:32 p.m. on September 15, 2011; the day of her termination. It is undisputed Patenaude was out of the office, and there is no evidence he received the e-mail prior to making the termination decision. This conclusion is further supported by Montiel's own testimony that she sent the e-mail after the investigatory meeting with Warner, and she was aware termination was imminent when she sent the e-mail.

20

because other "similarly situated employees" were not terminated, Montiel must show other employees are similarly situated in all respects, that is, they " ' "engaged in the same conduct without any mitigating or distinguishing circumstances." ' " (*Wills*, *supra*, 195 Cal.App.4th at p. 172.)

First, Montiel claims that Jim Heidman and Frank Vargas pushed each other, and neither was terminated. The only evidence Montiel offers to support this claim is the testimony of a third party who admits he did not see the incident and does not recall what was said or reported about the incident. Montiel presents no evidence regarding what actually occurred, why it occurred, and the discipline each participant received if any. Nor does she have evidence that they engaged in later misconduct after being disciplined.

Montiel also complains Broderick Crawford brought knives to work, but was not terminated. The evidence in the record shows that Crawford brought knives to work and a coworker who noticed Crawford brought a knife to work told him that he could not do so. Montiel presents no evidence regarding when or if management learned about the incident, what discipline Crawford received, and whether he violated the policy after being warned.

Additionally, Montiel complains P&F did not discipline or terminate Carter although she threatened other employees. However, the superior court excluded most, if not all the evidence showing Carter's threats. Montiel fails to address any of these evidentiary rulings. Accordingly, we do not review the court's rulings for an abuse of discretion and we will not consider the evidence. Montiel therefore has offered no

21

evidence of Carter making threats, being disciplined for those threats, or making a threat after she received a warning. The only admissible evidence of threats involving Carter show that P&F held a meeting to investigate Montiel's complaints about Carter. During that meeting, Montiel threatened Carter, causing Warner to discipline both Carter and Montiel, even though Carter did not threaten Montiel at the meeting. Although Montiel now complains other coworkers had issues with Carter, there is no evidence in the record to support Montiel's position.

In short, Montiel fails to offer evidence that shows another employee was warned and suspended for violating the workplace violence policy, but was not discharged for a final incident. Thus, she has not shown pretext by identifying a similarly situated employee who was treated more favorably.

In summary, we conclude Montiel has not offered evidence to create a triable issue of material fact supporting her claim that P&F's stated justification for terminating her employment was pretextual. As such, causes of action nos. three, five, and six should not have survived Respondents' motion for summary adjudication.

### D. Causes of Action Nos. One and Two

Montiel challenges the court's grant of Respondents' motion as to causes of action nos. 1 (hostile work environment sexual harassment) and 2 (quid pro quo sexual harassment) on multiple grounds. She argues Respondents did not carry their burden of establishing a statute of limitations defense. In the alternative, she asserts that even if Respondents established the elements of a statute of limitations defense, the continuing violation doctrine prohibited granting summary adjudication as to the first cause of action

22

in any event. Montiel also maintains the complained of conduct was sufficiently severe and pervasive to alter the terms and conditions of her employment. Finally, Montiel insists there was sufficient evidence of quid pro quo harassment. We conclude Montiel's contentions are without merit.

### 1. Sexual Harassment Law in California

California law prohibits sexual harassment in the workplace. Under California law, "an unlawful employment practice" is defined as an employer's refusal to hire, employ, or select for a training program leading to employment, any person because of that person's "race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, [or] sexual orientation . . . ." (§ 12940, subd. (a).)

With respect to sexual harassment in the workplace, the prohibited conduct ranges from expressly or impliedly conditioning employment benefits on submission to, or tolerance of, unwelcome sexual advances to the creation of a work environment that is "hostile or abusive to employees because of their sex." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462 (*Miller*).) Thus, FEHA "recognize[s] two theories of liability for sexual harassment claims. [Citations.]' . . . 'quid pro quo harassment, where a term of employment is conditioned upon submission to unwelcome sexual advances . . . [and] hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work

23

environment.' " (*Herberg v. California Institute of the Arts* (2002) 101 Cal.App.4th 142, 149 (*Herberg*).)

In construing FEHA, our high court has held that the hostile work environment form of sexual harassment is actionable only when the harassing behavior is pervasive or severe. (*Miller*, *supra*, 36 Cal.4th at p. 462.) To prevail on a hostile work environment claim under FEHA, an employee must show that the harassing conduct was "severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their sex." (*Miller*, *supra*, at p. 462.) There is no recovery "for harassment that is occasional, isolated, sporadic, or trivial." (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 283 (*Lyle*).)

Courts that have construed California employment discrimination laws have held that an employee seeking to prove sexual harassment based on no more than a few isolated incidents of harassing conduct must show that the conduct was "severe in the extreme." (*Herberg, supra*, 101 Cal.App.4th at p. 151; accord, *Lyle*, *supra*, 38 Cal.4th at p. 284, citing *Herberg* with approval.) A single harassing incident involving "physical violence or the threat thereof" may qualify as being severe in the extreme. (*Herberg*, *supra*, at p. 151.)

Under FEHA, the existence of a hostile work environment depends upon "the totality of the circumstances." (*Miller*, *supra*, 36 Cal.4th at p. 462.) "To be actionable, 'a sexually objectionable environment must be both objectively and subjectively offensive.' " (*Lyle*, *supra*, 38 Cal.4th at p. 284.) Therefore, "a plaintiff who subjectively

24

perceives the workplace as hostile or abusive will not prevail . . . if a reasonable person . . . considering all the circumstances, would not share the same perception." (*Ibid*.)

### 2. *Statute of Limitations*

The statute of limitations defense is an affirmative defense. To obtain summary judgment, the defendant has " ' "the initial burden to show undisputed facts support each element of the affirmative defense," ' " at which point the burden shifts to plaintiff to show a triable issue of material fact. (*Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 467-468.)

"FEHA claims are governed by two statutory deadlines: section 12960 and section 12965." (*Acuna v. San Diego Gas & Electric Co.* (2013) 217 Cal.App.4th 1402, 1411 (*Acuna*).) "Section 12960[, subdivision (d)] provides that an employee bringing an FEHA claim must exhaust the administrative remedy by filing an administrative complaint with the ([Department of Fair Employment and Housing (DFEH)] within one year after the alleged unlawful action occurred. [Citation.] This code section states that with certain exceptions not applicable here: 'No [administrative] complaint may be filed after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred. . . . ' " (*Acuna*, *supra*, at p. 1412.)

"Section 12965[, subdivision (b)] concerns a separate statutory deadline applicable *after* the DFEH issues a right-to-sue notice. The code section provides that after an employee files a complaint and the DFEH does not issue an accusation within a specified period, the DFEH must issue a right-to-sue letter notifying the employee that he or she

25

may bring a civil suit within one year of the date of the notice. [Citations.] This code section establishes a strict 'one-year statute of limitations, commencing from the date of the right-to-sue notice by the [DFEH],' except for certain statutory exceptions. [Citation.] Section 12965's one-year deadline from the right-to-sue notice is 'a condition on a substantive right rather than a procedural limitation period for commencement of an action.' [Citation.] Thus, it ' "cause[s] the right which previously arose and on which a suit could have been maintained, to expire." ' " (*Acuna*, *supra*, 217 Cal.App.4th at p. 1413; original italics.) Accordingly, to satisfy the statute of limitations, Montiel must have: (1) exhausted her administrative remedies "within one year after the alleged unlawful action occurred"; and (2) filed a civil lawsuit "within one year of the date of the [right to sue] notice" issued by the DFEH. (*Id*. at pp. 1412-1413; §§ 12960, subd. (d); 12965, subd. (b).)

Montiel did not file her harassment complaint with the DFEH until March 19, 2012. Therefore, conduct occurring prior to March 19, 2011 is time-barred, unless an exception applies.

Here, the parties disagree regarding who has the burden to show when the misconduct occurred. Montiel argues that Respondents must show that none of the offending conduct occurred after March 19, 2011 because they must prove the statute of limitations affirmative defense. In response, Respondents maintain that Montiel's position is "nonsensical" because she is "the very person who allegedly experienced the harassing conduct."

In its separate statement of undisputed material facts, Respondents assert "Montiel claims that Nelson's alleged conduct 'slowed down' in 2011 when he allegedly shifted his attention to a different employee." Montiel disputed this fact, but her dispute was nothing more than semantics: "DISPUTED. [Montiel] testified Nelson's sexually harassing conduct slowed down when he began pursuing someone else that was willing to go along with his advances- not when he 'shifted his attention to a different employee.' " Montiel's does not dispute the fact that Nelson's offending contact "slowed down" in 2011. In addition, Respondents emphasize that there are no allegations in the second amended complaint identifying any misconduct occurring after March 19, 2011. Thus, on the record before us, we are left with a critical unanswered question: what misconduct occurred after March 19, 2011, if any?

Montiel ignores this key, unanswered question and retreats to her position that Respondents have not shown that no misconduct occurred after March 19, 2011. Montiel's response begs the question what more should Respondents be required to do. There are no allegations in the second amended complaint of misconduct occurring during the applicable period. The simplest solution to these shortcomings would be for Montiel to offer any evidence (e.g., deposition testimony, e-mails, other correspondence, or even a self-serving declaration) that details any misconduct occurring after March 19, 2011. She would not have to provide an exact date--an approximate time period (e.g., June 2011) would do. Put differently, we are troubled by the lack of any evidence in the record that establishes misconduct occurred after March 19, 2011. We struggle to

27

understand why Montiel, the victim of the misconduct, does not provide this evidence, even in the most general manner.

Montiel has pointed us to evidence showing "multiple witnesses viewed unwanted shoulder rubs by . . . Nelson" as well as her testimony of several examples of Nelson's misconduct. Curiously absent with any of this evidence, however, is an indication that the conduct occurred after March 19, 2011. For example, Montiel testified that Nelson "grabbed her butt" twice sometime in 2011. She was unable to give a month when these incidents occurred. In addition, Montiel points to the deposition testimony of fellow employee, Valerie Bailey, who stated she witnessed Nelson asking Montiel for a kiss on the check in the elevator. When Montiel declined and told Nelson to stop, Nelson responded, "Well, how do you think you are going to get a raise or get promoted?" Bailey testified that this incident took place between late 2010 and April 2011. Neither Bailey nor Montiel were able to offer any further detail regarding when this incident occurred.

Summary judgment motions are to expedite litigation and eliminate needless trials. (*Hood v. Superior Court* (1995) 33 Cal.App.4th 319, 323.) It would be the very definition of a needless trial to allow the instant matter to proceed to trial on the statute of limitations issue when Montiel is either unable or unwilling to provide evidence that any misconduct actually occurred after March 19, 2011. Having concluded that Montiel has not shown any misconduct occurred during the statute of limitations period, we determine the superior court did not err in finding the first two causes of action time-barred.

28

### 3. Continuing Violation Doctrine

Montiel next argues that her first two causes of action should not be time-barred because of the continuing violation doctrine. We disagree.

The continuing violation doctrine applies when an employer's unlawful actions are: (1) sufficiently similar in kind; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence. (*Richards v. CH2M Hill, Inc*. (2001) 26 Ca1.4th 798, 823 (*Richards*).) Montiel has not satisfied any of these elements.

The first element requires conduct outside the statutory period (i.e. before March 19, 2011) be "sufficiently similar in kind" to conduct within the period. In other words, at least some instances must occur during the limitations period. (*Trovato v. Beckman Coulter, Inc.* (2011) 192 Cal.App.4th 319, 326 [plaintiff cannot establish continuing violation if no conduct occurred in limitations period]; *Acuna*, *supra*, 217 Cal.App.4th at p. 1417.) As discussed, Montiel has not established any alleged instances actually occurred within the statutory period. As such, she fails to satisfy the first element of the continuing violations doctrine.

Montiel also has not shown the alleged conduct "occurred with reasonable frequency" during the limitations period. (*Richards*, *supra*, 26 Ca1.4th at p. 823.) At best, Montiel has presented three incidents of misconduct that might have occurred within the statutory period. These three incidents are not sufficient to establish the harassment was continuous. (See *Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 613 (*Fisher*) ["Although acts beyond the statute of limitations might be relevant to showing a pattern of continuous harassment [citation], if only a couple of acts

29

occurred during the one year preceding the filing of the complaint, then [the employee] cannot properly plead a claim for environmental sexual harassment."].)

Finally, the evidence Montiel presented shows that the harassment acquired a degree of permanence prior to March 19, 2011. Our high court held that the tolling period under the continuing violation doctrine ends when the employer achieves a level of permanence, i.e., when a reasonable employee would understand "further efforts to end the unlawful conduct will be in vain." (*Richards*, *supra,* 26 Cal.4th at p. 823.) Such futility manifests in a number of ways, including if the employer ignores the employee's complaint on several occasions. (*Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1035-1037, 1042-1043 (*Cucuzza*) [complaint reached permanence after supervisor repeatedly refused to address plaintiff's request to work in a particular job and plaintiff's internal grievances challenging these decisions were denied]; *Acuna*, *supra*, 217 Cal.App.4th at pp. 1414-1415 [failure to accommodate claim achieved permanence when employer denied informal accommodation request for a second time and employee hired attorney].)

Montiel asserts she complained of harassment to Jauregui in 2009, Merrigan in December 2010, and Warner in January or February 2011 (although she does not remember what she told Warner about Nelson's misconduct beyond unwanted shoulder massages). She further alleges Jauregui "knew what was going on"; and after she complained to Merrigan, he told her, "You know, I'm going to tell you something. If it's between you or [Nelson], you're going to be the one to go." She also states that Warner did not resolve her complaint. In short, Montiel complained to several supervisors and

30

the head of human resources, but received no resolution. At that point, a reasonable person would have determined further efforts to have P&F resolve the complaints were futile. (See *Cucuzza*, *supra*, 104 Cal.App.4th at pp. 1035-1037, 1042-1043.) This is especially true on the record before us because Montiel alleges that Merrigan and Jauregui not only ignored her complaints, but threatened her in response to her complaints, and Warner allegedly was looking for a way to terminate her.

In summary, Montiel has not proved any element of the continuing violation doctrine exits, and therefore, that doctrine does not save her first and second causes of action from being time-barred.

### E. Cause of Action No. Nine

Montiel next maintains the court erred in granting summary judgment because Respondents failed to engage in an interactive process. We are not persuaded.

To prove a claim for failure to engage in the interactive process, the employee must establish: (1) the employer knew of a disability; and (2) the employee requested a reasonable accommodation. (§ 12940, subd. (n); *Scotch*, *supra*, 173 Cal.App.4th at pp. 1013-1016.) Only then is the employer required to engage in the interactive process. (See *Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1252-1253 (*Avila*) [affirming summary judgment, holding that doctor's notes and three absences did not put the employer on notice of a disability or need for accommodation].)

Montiel argues she submitted the following evidence of her disability such that P&F was required to engage in the interactive process: (1) a January 2011 e-mail to Warner where Montiel told her she was "stressed out"; (2) a March 2011 e-mail to

31

Patenaude where Montiel told him she was "stressed out" and taking "pills to calm [her] nerves"; and (3) during a conversation with Patenaude in May 2011, he advised Montiel to see a doctor.

Montiel's evidence falls short of establishing that P&F was on notice of Montiel's disability. In *Avila*, *supra*, 165 Cal.App.4th 1237, the plaintiff provided the employer with two doctors' notes indicating he was ill, had been hospitalized, and needed four days off. (*Id.* at p. 1249.) The notes did not identify any disability or work restrictions that required accommodation. (*Ibid*.) The superior court granted summary judgment, finding the notes did not identify the employee's illness, "let alone a disability" that required accommodation. (*Id*. at pp. 1247-1248.) The Court of Appeal affirmed, determining the employee failed to put the employer on notice that he had a disability or needed an accommodation, and as such, there was no requirement to engage in the interactive process. (*Id*. at pp. 1248-1249; see *Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 943-944 [employer required to engage in interactive process when it learned plaintiff's AIDS prevented him from flying]; *Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 887 [employer required to engage in interactive process when employee submitted documents identifying medical condition and work limitations].)

Further, there is nothing in the record indicating Montiel submitted any medical notes or other evidence showing she had a disability or needed accommodation. Indeed, the only medical document Montiel submitted excused her for missing two days of work and returned her to work without any restrictions. After returning to work, Montiel chose

32

to continue working, and would, from time to time, not to come to work if she suffered from headaches.

In her opening brief, Montiel does not cite to any evidence whereby she asked for an accommodation. Respondents point out that during her deposition, Montiel stated she asked for a mouse pad for her wrist. Apparently, she had seen another coworker use it and wanted one for her work station. She did not provide a doctor's note suggesting she needed a wrist device, never followed up with a formal request, and does not explain how a mouse pad would have alleviated her stress or headaches. Moreover, during her deposition, Montiel stated that she would not refer to herself as disabled, but was hurting. It is not clear from the record that she told P&F the source of her pain and what she needed to alleviate it.

In short, we do not find any evidence that Montiel put P&F on notice of any disability or need for accommodation. As such, Montiel's ninth cause of action should not have survived summary adjudication.

### F. Cause of Action No. Eight

Montiel contends the superior court erred in finding her eighth cause of action for battery barred by the workers' compensation exclusivity doctrine. We agree.

" ' "A battery is any intentional, unlawful and harmful contact by one person with the person of another. . . ." ' " (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1495.) " 'The elements of a civil battery are: " '1. Defendant intentionally did an act which resulted in a harmful or offensive contact with the plaintiff's person; [¶] 2. Plaintiff did not consent to the contact; [and] [¶] 3. The harmful or offensive contact caused injury,

33

damage, loss or harm to the plaintiff.' "  [Citation.]'  [Citation.]"  (*Ibid.*)

Here, the parties do not dispute that evidence shows a battery was committed. Nevertheless, this agreement does not resolve the issue before us.  The battery occurred at work.  The workers' compensation laws include broad exclusivity provisions, setting forth the rule that those laws will provide the sole remedies for many job-related injuries. (See, e.g., Lab. Code, § 3600.)  Typically, when a coworker is injured by another coworker, the injured coworker may only seek compensation through the workers' compensation scheme of laws.  (Lab. Code, § 3601, subd. (a).)  However, the injured coworker can bring an action for damages directly against the coworker if the injured employee's harm was "proximately caused by the willful and unprovoked physical act of aggression of the other employee."  (Lab. Code, § 3601, subd. (a)(1).)

As a threshold matter, we note Montiel and Nelson disagree regarding what constitutes a willful act of aggression as set forth in Labor Code section 3601, subdivision (a)(1).  Montiel contends it merely requires a willful act.  Therefore, according to Montiel, the battery claim is not barred by the exclusivity provision of the workers' compensation scheme of laws as long as Nelson intended to touch her.  Montiel does not cite any authority to support her position.

Nelson counters that the willful act of aggression requires, not only the intent to perform the act of aggression, but also the intent to injure.  Nelson is correct.   Our Supreme Court made clear that to fall within the exception to the exclusivity of workers' compensation, there must be an intent to injure.  (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1006 (*Torres*) ["We conclude, as a general rule, that a 'willful and

34

unprovoked physical act of aggression' includes an intent to injure requirement."].)

Therefore, we must look at the record to determine if there exists a disputed fact regarding Nelson's intent to injure Montiel.

In support of his motion for summary judgment, Nelson proffered the material fact that he did not intend to harm or offend Montiel. To establish this fact, Nelson offered his own declaration in which he states: "I never intended to harm Montiel in any fashion." He also declared that he believed he was friends with Montiel and emphasized his positive interaction with Montiel. Montiel disputed the material fact by offering evidence of numerous examples of Nelson allegedly harassing her (e.g., rubbing his hand up her leg, massaging her, hugging her tightly) from sometime prior to 2009 to present day. In her reply brief here, however, Montiel all but concedes that the conduct in 2009 would be time-barred under battery's two-year statute of limitations (see Code Civ. Proc., § 335.1), but argues Nelson's 2009 conduct is "relevant to the issue of Defendant Nelson's intent while grabbing [her] butt and giving her unwanted should rubs within the [statute of limitations]." Thus, by Montiel's own admission, the conduct supporting the battery claim is limited to unwanted shoulder rubs and Nelson grabbing Montiel's rear twice.

Based on Nelson's acts of grabbing Montiel's backside twice, we conclude there is a disputed issue of material fact whether Nelson intended to injure Montiel. Montiel has provided evidence of Nelson's past acts of touching or attempting to touch her in a sexual manner. There also exists evidence that Montiel had told Nelson through her own actions and verbally that she did not desire a romantic relationship with him. This evidence supports the inference that Nelson knew that Montiel did not wish to have a sexual

35

relationship with him. And, Montiel testified that she was upset by Nelson touching her backside and Nelson apologized for touching it and claimed to be walking too close to her. Yet, even with this knowledge, Nelson touched Montiel in a sexual manner when he grabbed her backside twice. And at least one of those grabs followed the earlier grab to which Montiel responded negatively and let Nelson know she did not appreciate being touched that way by him. This evidence supports a conclusion that Nelson entertained a desire to injure her, and not simply that he engaged in intentional conduct. (See *Torres*, *supra*, 26 Ca1.4th at p. 1006.) We cannot say, as a matter of law, that an employee touching another employee on an intimate part of his or her body, without permission, does not constitute an intent to injure the victim. Accordingly, the superior court erred in finding Montiel's battery claim was barred by workers' compensation exclusivity.

### G. Causes of Action Nos. Four and Seven

Montiel argues that the court erred in granting summary adjudication of the fourth cause of action for failure to prevent harassment based on its erroneous rulings on the first and second causes of action. Because we conclude the superior court did not err as to the first and second causes of action, Montiel's argument regarding her fourth cause of action lacks merit.

Similarly, Montiel asserts the court erred in granting summary adjudication of the seventh cause of action for intentional infliction of emotional distress based on its erroneous findings that there was no unlawful gender discrimination, retaliation, or harassment. Having determined no error exists as to any of these findings, Montiel's assertion regarding her seventh cause of action must fail as well.

36

DISPOSITION

We reverse the judgment as to the battery claim. We remand this matter back to the superior court with the following instructions: The superior court is to enter an order granting summary adjudication as to causes of action Nos. one through seven and nine. The order shall state that summary adjudication is denied as to Montiel's eighth cause of action for battery. The superior court shall engage in further proceedings consistent with this opinion.

The parties are responsible for their own costs on appeal.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


HALLER, J.